JOHN W. GIFFIN

*v.*

DAVID GASCOIGNE.

[Filed July 30th, 1900.]

1. The custody of a child should remain with his parents irrespective of greater benefits which the custody of another might secure for him, unless the character of the parents, or the environment to which the child would in their charge be subjected, is such as actually to endanger his life, health, morals or permanent happiness.

2. The burden of the proof showing the unfitness of parents to have the custody of their children is upon those who allege it.

On bill, answer, cross-bill and proofs.

*Mr. Howard Carrow* and *Mr. Wheaton Berault,* for the complainant.

*Mr. Herbert C. Bartlett,* for the defendant.

GREY, V. C. (orally).

This case involves the determination of the right to the custody of a boy of fourteen years of age, who is now in court, and, under the circumstances, ought to be disposed of while the minor child is here present. There are many facts in the case which

are undisputed, and not many which are disputed. It is conceded by both sides that the complainant, John W. Giffin, is the sole surviving parent of this boy, who, in September, 1899, was fourteen years of age. The boy had lived with his father in Cleveland, Ohio, up to the early part of the year 1897. His father's domestic affairs were most unhappily situated. He had difficulties with his second wife (not the mother of this boy) to an extent which made the family life extremely miserable. The testimony, as taken on the commission, is that, three years ago, during the period of the second marriage, the father's conduct toward the wife was cruel and inconsiderate, and that he became, at times, intoxicated, and was occasionally harsh and, perhaps, cruel to the children. That testimony was given without cross-examination, and, apparently, *ex parte,* but it is corroborated, to some extent, by the testimony of the minor child himself, given here in court this morning. The father, in view of the unhappy circumstances of his household, seems to have desired to make some arrangement for the care of his boy at some other place than his home.

A divorce suit was brought in Ohio, by the wife, and final judgment was given therein, divorcing the husband and wife. For a day or two after the separation of the husband and wife the boy Herbert stayed with his stepmother, and then was taken to the house of his aunt, Mrs. Hobart, his father's sister. This lady was then caring for her father, a very old gentleman, who was ill, and, because of this, the boy was temporarily kept at the residence of another aunt, and was afterwards sent east to his grandfather Gascoigne's family. This grandfather is the defendant in this suit, and now contends that the sending of the boy to his house was a finality; that it was an abandonment and an emancipation of the boy, by which the further custody and care of him for his support and education was given to this grandfather, and that is the first point made in assertion of the defendant's right to the final custody of this child.

The weight of the testimony shows that the arrangement which was made was not one of abandonment by the father of the child, nor was it to deposit him with his grandfather for his education and maintenance until he became of age; nor was it,

Giffin *v.* Gascoigne.

indeed, anything but a seeking by the father to have a temporary home for his child because of the unhappy conditions of his own family life. The proofs show neither agreement that the father surrendered the child, nor that he was in any way relieved from the obligation to maintain him. The complainant contends that the child was placed in his grandfather's family to board. While the answer denies that, I am satisfied that the denial is not in accordance with the evidence. The letter inviting the grandfather's family to take the boy asked them to take him to board. Money was paid, in part by the father, and, to the amount of $175, by the aunt, Mrs. Hobart, not with regularity, nor in such sums as would fully satisfy a reasonable compensation for the boy's board, but it was paid for the maintenance of the boy in the defendant's family, and was so received. There was clearly a recognition of the continuance of the obligation on the part of the father to support the boy, and that he was at his grandfather's house not under the latter's support and control, but still under his father. The attitude which the boy took in the family of his grandfather was that of a person who came to board, put there by one who had a right to put him there, for pay, and that the pay was in part given and was received as payment rightfully due for a service rendered. There has been some reference to the fact that some of the pay for board is yet due, but nobody pretends for a moment that the custody of the boy could be retained by the grandfather until the board is paid. Of course, there could not be a lien upon the child for the payment of his board. The delivery of the child would not relieve the father from the obligation to pay the board. But that in no way affects the right of the father to the custody of his child, who does not in any degree lose his right to the custody of his child because he put him out to board.

The next point made by the defence (and it is the most important one in the case) is that the grandparents, although they have received this boy, as I am bound to hold, under a contract to maintain and support him for pay, had a right, and have now at the present time a right, to retain this child in their custody against the claim of the father, because, they say, the father is not a fit person to have the boy in charge.

There has been some misunderstandings of the law touching the choice of a minor child himself as to his custody. This has arisen because of a somewhat novel proceeding in the case of *Richards* v. *Collins, 18 Stew. Eq. 283.* That case involved the question of the custody of a child, and the court of appeals held that where the child was of an age to have an opinion which might be worthy of consideration, the court would receive the expression of the wishes of the child as to the custody in which he might prefer to be placed. The court did not, however, say that the preference of the boy should be conclusive. Like other evidence it is to be considered by the court, it is to have its proper weight in determining the question as to future custody. In this case the boy is well grown and over fourteen years old, though obviously quite immature, easily influenced and controlled rather by the desire to continue relations presently kindly and affectionate, than by a considerate judgment touching his general welfare in the future. His testimony has been admitted and favors his retention by his grandfather. It is, in my judgment, of little significance, as the proof shows that for months past his whole course of life has been arranged by his aunts, part of his grandfather's family, for the purpose (though they deny it) of concealing him from his father, so that he might not even see him. Such a line of conduct, vigorously pursued, makes the opinion of an undeveloped, impressionable child of little value. He has been taught to regard his father as a "bugaboo," and here expresses the impression thus imposed upon him. But little weight can be given his personal preferences, as I shall, in a moment, show by reference to his conduct so lately as last summer (1899), while visiting his father and his aunts in Cleveland.

The case above cited is also referred to as an authority to the effect that the court would disregard the family relation and award the custody of the child to that one of the litigants who would and could deal with it most beneficially for its future welfare. I cannot accept that as a true statement of the judgment in *Richards* v. *Collins.* Such a view would take his child from the poor man and give it to his richer neighbor who might offer to adopt it. It would stand as a temptation to the break-

ing of family ties whenever the attractiveness of a child might tempt a stranger, who could secure it a higher station in life, to make the struggle for its possession. In the rightful adjustment of the family relation the child should occupy that station in life into which he is born. If his father is poor, he must share his poverty. If the father is cross and ill-tempered and is occasionally inebriated, these are distressful characteristics which may make the child's life less happy, but, until it is shown that they are of such force and importance as to endanger the child's welfare in that place in life into which it has pleased God to call him, their existence constitutes no reason to deprive the father of his possession of his child.

The true view, and that which, on the whole, judgment was held in the case above cited, is that the custody of the child should remain with his parents, irrespective of greater benefits which the custody of another might secure for him, unless the character of the parents and the environment to which the child would, in their charge, be subjected is such as actually to endanger his life, health, morals or permanent happiness.

The father is entitled to have his child unless those who allege him to be unfit prove their allegation to be true. In the case in hand the undisputed evidence as to pecuniary capacity is that the father is worth some $15,000; that the aunt, Mrs. Hobart, with whom the child, if given to the father, will have his future home, is worth $25,000; that she has no children of her own, and intends to give this boy a substantial part of her estate; that it is the father's purpose to give the boy a collegiate education, and thus fit him in the best manner to advance his future interests. The character and position of the aunt, Mrs. Hobart, are in no way questioned, and her entire worthiness is apparent in both her appearance and in the frankness of her testimony. It is shown, as above stated, that some three years ago, during the period of his unhappy family trouble with his second wife, the complainant was sometimes intoxicated; that he was, on several occasions, harsh and, perhaps, cruel to his family; that he resided, for a while, over a beer saloon, and on one occasion took his son into a saloon and gave him a drink of "pops." But the testimony does not

satisfy me that the inebriation was habitual, or that the father's harsh conduct was more than occasional, or that it was anything but the momentary expression of a passing feeling. The most careful examination failed to show that the drink called "pops," which the boy said his father gave him in the saloon, produced any intoxicating effect. While the father lived over the saloon, and during the unhappy period of his separation from his wife, he cared for the boy by placing him with his sisters and with the defendant. After the boy was sent to the defendant's house the father sent him a bicycle and a piano, and in the summer of 1899 had him brought out to Cleveland for a visit, of some six weeks, at his aunt's, Mrs. Hobart. During this period the father and son took frequent bicycle and carriage rides together, and there seems to have been a perfect restoration of kindly and affectionate feeling between them, and no mention, on careful inquiry, of a single act of indiscretion or misconduct on the part of the father. To such an extent was this reconciliation that the boy cried when he was about to end his visit and return to the defendant's house. The boy admitted that he cried upon leaving Cleveland, and sought to deny that it was because of regret for his coming away, but his manner on the stand and his explanation satisfied me that there was, so late as the summer of 1899, the warmest affection and confidence between the father and the son, and that his denials of regret at this parting were the results of the influence of his present surroundings. There has been no proof that the father, since three years ago, has abandoned himself to the habit of intoxication. The sister, Mrs. Hobart, with whom he lives, testifies that but once or twice has she known him to be affected by liquor, and then only to a slight degree.

On the other hand, the testimony of the defendant and of his daughter was not given with candor. There was constant hesitation to reply to questions the answers to which might be unfavorable. Both the defendant and his daughter sought to convey the impression that there has been no effort to prevent the father from seeing the son. But the proofs plainly show that most energetic steps were taken to keep the boy from the father. The boy was even taken from school and sent to Phila-

---

Giffin *v.* Gascoigne.

---

delphia for several months, obviously for no other reason. The grandfather surreptitiously, without notice to the father, took out letters of guardianship upon the boy's person and estate, without the least occasion, as the boy has no estate. The defendant and his family, for the past eight months, have been vigorously struggling to secure for themselves the custody of this child from the father, and on the stand they seek to create a contrary impression. Their attitude is so strenuous that it leads me to believe that the boy, living for months in such an environment, reflects, in his testimony unfavorable to his father and in his expression of preference to live with the defendant, the feelings which his aunt, Miss Gascoigne, impressed upon him, and not his own uninfluenced choice.

The evidence indicates that however his feelings may be temporarily hurt in leaving the family of the defendant, there is no likelihood that his permanent happiness will be in any way endangered by his return to the custody of his father, nor is there, upon the whole case, a showing of any reason sufficient to justify depriving this father of the custody of his child.

I will advise a decree that the boy be restored to the permanent custody of the father, in accordance with the prayer of the bill, and that the cross-bill, by which the defendant seeks to have the boy awarded to him, be dismissed, with costs on both decrees against Mr. Gascoigne.