## EX PARTE SUMMERS

### (181 N. W. 831.)

(File No. 4756.   Opinion filed March 10, 1921.   Rehearing denied May 11, 1921.)

1. **Habeas Corpus—Custody of Child—Child in Defendant's Charge at Sick Mother's Request, Father Consenting After Mother's Death, He Offering to Pay for Care—Father Employed at Distance, Non-permission to Return by Federal Employees—Missent Letters, Father's Re-marriage and Request for Child—Insufficient Showing of Abandonment of Child.**

Where, upon application for writ of habeas corpus, it appeared that the applicant child's sick mother (a professional nurse, who for several years had been a warm personal friend of and for over a year had lived with defendant's family without charge and as a member of the family) placed it in defendant's custody and care, the mother soon thereafter dying, the husband consenting to such custody but telling defendant he would pay for caring for it, defendant saying she wanted

the baby, not pay for keeping it, the father thereafter variously employed in Watertown, S. D., defendant's place of residence and outside of the state as a salesman, and thereafter at Port Huron, Mich., as employee of Federal Government Agents during the European war and who refused to allow him to return home, he thereafter mailing several·letters to defendant which were returned, she having removed to Sioux Falls; he thereafter having written to her and informing her of the former letters·and that he had sent packages, that he was again married, had a home and wanted his child, his present wife thereafter writing to defendant and receiving response that her husband's letters had not been received, defendant never having written to the father; **held,** that trial court's finding that the father had been guilty of a course of conduct amounting to abandonment of the daughter was contrary to and unsupported by the evidence; he having never consented to surrender or abandon his right to its custody and control; that while for more than two years he did not visit defendant's home or the child, his letters of inquiry under circumstances shown, negative the existence of intent to abandon the child.

2. **Same—Father, Sober, Industrious, Moral, Failure to Pay for Child's Care in View of, Effect—Insufficient Evidence of Impropriety of Father's Custody, Control.**

Under the facts shown, trial court erred in finding that the father by reason of neglect and failure to provide for the child and "of the other circumstances appearing" was not a suitable and proper person to have the care, custody and control of it; such finding being unsupported by the ˙evidence, which indisputably shows the father to have been sober and industrious and without vicious or immoral habits or associations, the only criticism being that he failed to pay respondents for its care and maintenance, such fact not establishing his unsuitableness as a proper person to have such care, etc., he having expended the insurance money coming upon his wife's death in payment of expenses of her illness and death and his own illness, etc., and having meanwhile creditably held various positions involving important responsibilities; certain adoption proceedings not having been notified to the father and no claim being made thereunder beyond their evidence of good faith.

3. **Same—Finding of Child's Affection for Foster Parents, Effect Re Young Child—Rule, Child's Best Interests, Custodian's Rights Secondary—Burden of Proof.**

Finding of trial court that the affections of the child and its foster parents have become so engaged that a state of affairs has arisen which is unalterable without risking happiness and welfare of child was unwarranted by the evidence; that (fol-

lowing Hagglund v. Egge, 41 S. D. 433, 171 N. W. 212) the
first and principal inquiry by which courts are governed is,
what is for the best interests of the child?, the rights of the
parent or foster-parent being secondary; that while respondents
appear to be people of excellent character and impulses and
have become attached to the child by ties of association and
affection, and its physical and moral well-being would be safe
in their hands, yet it also appears the father is of good moral
character and habits and capable of giving it a suitable home
and support; hence the parental rights should prevail; which
rights should not be set aside except for strong and compelling
reasons; that the father's right under statute and at common
law is paramount and superior to that of any other person and
prima facie entitles him to the judgment of the court, unless
evidence shows its welfare requires it to remain with the
present custodian; the burden of establishing parent's unfaith-
fulness being upon relator.

Whiting and McCov, J. J., dissenting.

Appeal from Circuit Court, Minnehaha County. Hon. John
T. Medin, Judge.

In the Matter of the Application of Neva Summers, by Ray
P. Summers, her guardian, for Writ of Habeas Corpus. The
trial court having made an order and rendered judgment refus-
ing the writ, relator appeals. Reversed and remanded.

*Bailey & Voorhees,* and *Mather & Stover,* for Appellants.
*George J. Danforth,* for Respondents.

SMITH, J.  Habeas corpus to determine custody of a minor
child. Julia Helgemoe was a professional nurse, and for several
years had been a warm personal friend of, and for more than a
year had lived with, the family of Robert Evans, at Watertown,
without charge, and quite as a member of the family, when she
married plaintiff, Ray P. Summers. On April 24, 1914, a child
Neva, was born to them. In May, 1915, the mother, Julia, be-
came ill, and at her request Mrs. Evans took care of the child.
The mother died on June 25, 1915. The father, Ray P. Sum-
mers, consented that the child remain with Mrs. Evans. She
asked him to give her the baby. He did not consent to this, but
told her he would pay for caring for it. She said she wanted
the baby, not pay for keeping it. For several years before his
wife's death, and at that time, he had employment in Watertown.
He remained there for about a year and a half after his wife's

death, during which time he visited the Evans home frequently,
and paid Mrs. Evans some $20 or $25. At the end of that time,
the firm he was with went out of business, and he found it nec-
essary to seek employment elsewhere. He found employment in
another state as a salesman for a firm of lye manufacturers,
whose business was stopped by the war. He then found employ-
ment at Port Huron, Mich., with a company manufacturing war
materials; government agents, supervising the work, required all
employees to take oath that they would not leave such employment
until their duties ended, and plaintiff was refused permission to
return to South Dakota to visit the Evans home and his child.

During this time, and without his knowledge, the Evans fam-
ily had moved to Sioux Falls, and letters written to them at
Watertown were returned. He ascertained their Sioux Falls
residence through attorneys whom he employed for that purpose,
and at once wrote Mrs. Evans at Sioux Falls, telling her he had
written several letters which had been returned, and had sent two
packages, one in November and one in December, 1918; that he
was married again, had a home and wanted his child. In June,
1919, his letter being unanswered, his present wife wrote Mrs.
Evans, and received a postal card in reply, saying that letters
from Ray, had not been received; that she would write him later;
that Neva was well. She never wrote him. In December, 1919,
he again wrote Mrs. Evans, saying, in substance, that she had
treated him unfairly; that he wanted Neva, and unless she ans-
wered his letters he would have to come to Sioux Falls to get
her. This letter was unanswered. But during this time, on
March 19, 1919, and without any notice to him, the Evans filed
in the county court of Minnehaha county, a petition for adoption
of the child, alleging that her father had deserted and failed
to support her, and the court without his knowledge, on March
20, 1919, entered an order of adoption, and directed that the
child's name be changed from Neva Summers to Neva Faye
Evans.

Immediately upon being advised of these proceedings, plain-
tiff applied for and obtained this writ. The trial court made and
entered findings, conclusions, and judgment favorable to defend-
ants, and plaintiff appeals. The material questions raised by the

assignments of error relate to the sufficiency of the evidence to sustain findings of fact.

[1] The trial court found that appellant had been guilty of "a course of conduct that amounted to abandonment" of his infant daughter. We are of the view that such finding is contrary to, and is not supported by, the evidence. It is undisputed that appellant obligated himself to pay respondents for the care and maintenance of the child, and he never consented to surrender or abandon his right to its custody and control; and although for two years or more he did not visit the evans home or his child, he wrote frequent letters of inquiry, and, failing to receive any reply from respondents, finally employed attorneys to assist him in ascertaining their place of residence, and on every occasion reiterated his desire to have Neva with him, especially after he had married again and had established a home for himself and family. The state of mind thus clearly evidenced negatives the existence of an intent to abandon the child.

[2] The trial court also found that—

"The petitioner by reason of neglect and failure to provide for said child, and by reason of the other circumstances appearing in connection with this case, is not a suitable and proper person to have the care, custody, and control of said child. * * *"

A most careful consideration of the record compels the conclusion that this finding is not supported by the evidence. The undisputed evidence discloses that appellant is sober and industrious, and has no vicious or immoral habits or associations. Practically the only criticism sustained by the evidence is that he failed to pay respondents for the care and maintenance of the child; but that fact does not establish the conclusion that he is not a suitable and proper person to have the care, custody and control of his own child. It is undisputed that the insurance money which came to him upon his wife's death was expended in payment of expenses incident to her illness and death and his own illness and because of his inability to work for a considerable time because of eye trouble. He appears to have held, in recent years, various positions involving important responsibilities, in which no failures are recorded against him.

[3] The adoption proceedings are not in the record, but the findings made by the trial court disclose that no notice of such pro-

ceedings was given, and no claim is made thereunder by respondents, save that they evidence good faith in their interest in the welfare of the child. The trial court also found that—

"The affections of the child and its foster parents have now became so engaged * * * a state of affairs has arisen which cannot now be altered without risking the happiness and general welfare of the child."

In Re Wilson ('N. J. Ch.) 55 Atl. 160, the court said:

"The permanent happiness of a child under eight years of age is not likely to be affected by a change of custody from one person who loves her to another who will naturally treat her with kindly. consideration until association shall have developed her affection for her new caretaker."

And in Parker v. Wiggins (Tex. Civ. App.) 86 S. W. 788, the court said:

"Nor will the attachment of the child to its foster parents, by reason of kind treatment and association, be given serious consideration, unless the effort to reclaim it has been delayed until the child has reached that age where the presumption may be indulged that it is capable of forming and has formed a lasting affection for those to whom it is indebted for reciprocal love and maintenance, and that the sundering of such ties will subject to serious hazard its interest and happiness."

In Wilcox v. Wilcox, 14 N. Y. 575, a child less than a year old was placed with the father's father and remained there until she was nine years old; the father died, and, the mother then having ample means, the child was awarded to her. The court said:

"The fact that the child prefers her grandfather to her own mother and her own sister is an argument for changing her home, that her affections may be restored to their natural channel."

In U. S. v. Sauvage (C. C.) 91 Fed. 490, the court said:

"It will be noted that the first and principal inquiry * * * by which the courts are guided is, 'What is for the best interests of the child?' The several rights of the parent and foster parent are secondary to this principal question. That the welfare of the child, rather than the supposed absolute right of the parent, is the end the court seeks."

And this view was approved by this court in Haglund v.

Egge, 41 S. D. 433, 171 N. W. 212. Respondents in this case appear to be people of excellent character and kindly impulses, and no doubt have become attached to the child by ties of association and affection from early infancy, and it seems the child's physical and moral well-being would be safe in their hands. But it also appears that the father is of good moral character and habits, and is capable of giving his child a suitable home and support. Under such circumstances, we are of the view that the parental right should prevail.

The rights of the natural parent are not to be set aside, except for strong and compelling reasons. As was said by the court in Verser v. Ford, 37 Ark. 27:

"It is one of the cardinal principles of nature and of law that, as against strangers, the father, however, poor and humble, if able to support the child in his own style of life, and of good moral character, cannot, without the most shocking injustice, be deprived of the privilege by any one whatever, however brilliant the advantage he may offer. It is not enough to consider the interests of the child alone. * * * The preference is conceded to the ties of duty and affection, and attends the primary obligation of the father to maintain, educate and promote the happiness of the child, according to his own best judgment and the means within his power. Any system of jurisprudence which would enable the courts, in their discretion and with a view solely to the child's best interests, to take from him that right and interfere with those duties, would be intolerably tyrannical, as well as Utopian."

A father who had remarried after the death of his wife was held entitled to the custody of his child which by his consent had been given to the wife's mother shortly after the birth of the child. State ex rel. Lehman v. Martin, 95 Minn. 121, 103 N. W. 888. The court said:

"His right, as the child's father, both under the statute and at common law, is paramount and superior to that of any other person, and prima facie entitles him to the judgment of the court, unless the evidence shows that the child's welfare demands and requires that she remain with relator. The burden to establish his unfitness is therefore upon relator."

In Giffin v. Gascoigne, 60 N. J. Eq. 256, 47 Atl. 25, the court said:

"The true view * * * is that the custody of the child should remain with his parents, irrespective of greater benefits which the custody of another might secure for him, unless the character of the parents and the environment to which the child would, in their charge, be subjected, is such as actually to endanger his life, health, morals or permanent happiness."

In Herrick v. Richardson, 40 N. H. 272, it was held that the unfitness of the parent who claims the custody of his child must be shown by clear and satisfactory proof. We are of the view that this case comes clearly within the reason of the rule announced in Haglund v. Egge, supra, wherein this court said:

"Where it appears, as it does in this case, that the father is a person of good character, and where no reason or circumstance is shown to exist why he should not have the custody and control of his own child, we must hold, under the circumstances in this case, that his right is paramount to that of respondents."

In Jamison v. Gilbert, 38 Okl. 751, 135 Pac. 342, 47 L. R. A. (N. S.) 1133, a case analogous in many of its facts to the case at bar, reversing the order of the trial court awarding the custody of a minor child to its grandparents, the court used language which we deem apposite in this case:

"The aid defendants in error have rendered the father in caring for this child at a time when his circumstances were such that he was unable to give it personal attention is highly commenable, and may seem to them to merit their further custody and control of the child; but in calmer moments, when they have fully considered the matter and remember the love and affection for their own children and the pleasure and pride they took in rearing them, and realizing what a loss it would be to them to have surrendered their own children to others permanently, we think they will then conclude that they should do as they would be done by, and be willing that this father should have given to him that which is his own."

The order and judgment of the trial court are reversed, and the cause remanded for new trial. No costs to be taxed.

WHITING and McCOY, JJ. (dissenting.) The majority opinion is apparently based upon the assumption that this case is,

in its facts, similar to that of Haglund v. Egge, 41 S. D. 433, 171 N. W. 212. The law announced in the Haglund Case is applicable to this case. We do not care to recede one iota from what was held in the Haglund Case; but we do not agree that the facts in the present case are similar to those in the Haglund Case. We have always understood the rule of law to be that, where one seeks a reversal of the decision of the trial court upon issues of fact, the question presented to the appellate court is whether there was evidence supporting the decision of the trial court, and not whether there was evidence, which, if believed by the trial court, would have warranted a contrary decision. It seems to us as though the majority have assumed that the testimony submitted by the appellant was in all things true, and have disregarded the testimony submitted on behalf of the respondent.

Following the rule which we understand should guide this court, we are of the opinion that there was testimony which warranted the trial court in finding that appellant and the mother of Neva Summers were married but some three months prior to Neva's birth, and in finding that the conduct of appellant, after the death of this child's mother, was such as to indicate that he never had but little, if any affection, for the child's mother. Furthermore, according to the testimony submitted by respondents, from the time appellant left Watertown in 1917, respondents never received but two letters from him—one written soon after he left Watertown, while he was traveling as a traveling salesman, and the other written early in 1918, when he wrote asking them to send him certain property which he had left in their care. They denied ever receiving any other letters from him, and, while he testified to writing two letters which he offered in evidence, and which he testified had been returned to him uncalled for, the envelopes in which such letters were mailed were not introduced in evidence, and no explanation is offered for their absence.

It is undisputed that appellant's present wife wrote a letter to respondents in the summer of 1919, in which letter she stated that her husband had written several letters, but could not hear from respondents; but respondents immediately answered such letter, and stated to the writer thereof that they had not received any letters from her husband for a long period. It is undisputed

that from the time appellant left Watertown in 1917, until March, 1920, he never saw his child, and never contributed or offered to contribute one cent to its support, although he had received $1,100 insurance money upon the death of the child's mother. We are of the opinion that the trial court was fully justified in finding that, from early in 1918, until March, 1919, appellant neither in person nor through any representative communicated with respondents.

The trial court found that appellant was not a fit person to have the care and custody of this child. Such finding was fully warranted, while in the Haglund Case, Haglund was found to be in every way worthy of his child.

We are of the opinion that the judgment herein should be affirmed.