419 N.W.2d 689 (1988)
In the Matter of S.L. and L.L., Alleged Dependent and Neglected Children.
Nos. 15717, 15725.
Supreme Court of South Dakota.
Argued October 8, 1987.
Decided February 10, 1988.
Rehearing Denied March 17, 1988.
Robert L. Chavis, Yankton, for L.R. and A.R., maternal grandparents of S.L. and L.L.
*690 Lee D. Anderson, Mitchell, for L.L. and S.L., natural parents of S.L. and L.L.
Timothy Bjorkman, Bridgewater, for S.L. and L.L., alleged dependent and neglected children.
Janice Godtland, Asst. Atty. Gen., Pierre, for the State; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.
WUEST, Chief Justice.
Parents, S.L. (Father) and L.L. (Mother) appeal the termination of their parental rights to their two children, S.L. and L.L. We affirm.
The son, S.L., was born in August, 1980. The daughter, L.L., was born in July, 1983. In January, 1984, Mother contacted Denise Maricle (Maricle), a psychological counselor at the Dakota Mental Health Center in Mitchell. Mother indicated she was having problems with S.L.'s toilet training and general discipline. Maricle assisted Mother in developing parental techniques designed to correct simple child behavior and development problems. Maricle also made a referral to Kathleen Park (Park), a social worker with the Department of Social Services, and together they helped Mother enroll both children in a special needs day care program.
It soon became apparent that Mother and her children had other problems that needed attention, and in a cooperative effort, staff members from the Dakota Mental Health Center, the Department of Social Services, and the Methodist and St. Joseph day care centers began to share information and institute programmed services. The support given this family developed into a lengthy and involved effort that, beginning in 1984, would involve over two years of professional assistance.
In her psychological counseling with Mother, Maricle learned that Mother had been abusing S.L. psychologically. Mother was locking S.L. in his upstairs bedroom each night from about 7 p.m. until his bedtime at around 9 p.m., apparently out of a concern that S.L. might fall down the stairway in the home because the stairs did not have a hand rail. S.L. was therefore restrained from using the bathroom, sometimes on into the night. With some frequency, Mother was also shutting S.L. in his closet and calling him dirty names through the door. Sometimes she would spank S.L. so long that Father would need to intervene.
Maricle also learned there was other pathological behavior. Mother was inflicting physical harm on herself by burning herself with cigarettes and cutting herself with knives or razor blades, often in front of the children. Maricle initiated psychiatric care for Mother and referred her to the center's psychiatrist for appropriate medication.
Mother had a history of mental illness dating from about 1975. Between 1975 and 1980, Mother had three admissions to the South Dakota Human Services Center. In each of these admissions she presented problems of suicidal ideation and self-mutilation. Mother heard voicesvoices directing her to hurt herself or others. She had made several suicide attempts by overdose and had once attempted to abort her son by falling down a flight of stairs.
Following his placement in special needs day care, staff personnel noted that S.L. suffered from a number of physical, psychological, and emotional problems. S.L. suffered a pronounced delay in speech development for which he was receiving speech therapy. Physical strength and motor skills development were also delayed. S.L. had underdeveloped limbs, and he had little strength, spontaneity, or activity in his play. S.L. could not, for example, play catch with a ball.
As for psychological and emotional problems, at first the staff thought S.L. might have experienced sensory deprivation. He was socially delayed. S.L. had no eye contact or verbalization, and he would not allow physical contact. He had temper tantrums where he would throw himself on the floor kicking and screaming and flailing his arms. He was afraid to enter small rooms.
S.L. made improvements, however. In August, 1984, the director of St. Joseph's day care reported S.L. was no longer having temper tantrums or toileting accidents. *691 He had also learned to sit at the table while eating.
The staff at the day care center was also concerned about L.L. At this time she was one year old. She was not taking any solid food but was still on formula. She was sleeping from 8:30 to 11:30 in the morning. When put down for a nap, L.L. would bang her head in the playpen. She, like S.L., displayed nerotic traits that appear in emotionally neglected children.
In August, 1984, the Department initiated Intensive Placement Services (IPP). A social worker went into the home and worked with Mother on S.L.'s toilet training and speech therapy homework. The social worker also concentrated on the lack of parent-child interaction in the home. Mother later withdrew from the program, however, because she did not want to work with S.L.
Father was aware of S.L.'s developmental problems and had been trying to help in that area, but he did not learn of Mother's inappropriate behavior until after Maricle made a referral to the Department in January, 1985. Maricle was concerned about Mother's continuing behavior toward S.L. and discussed the situation with Father. Thereafter, Father and Mother enrolled in STEP parenting classes and marital counseling. Father also agreed to watch Mother's behavior, but he worked a night shift from 3 to 11 p.m. so his supervision and contact with the children when they were home in the evenings was limited.
The situation with Mother continued throughout 1985. Mother indicated to Maricle that, as of March, 1985 she had stopped locking S.L. in the closet, but she was having continuing difficulty with regard to S.L. On one occasion in May she mutilated some of S.L.'s personal possessions in his presence, including his teddy bear and some art work he had brought home. She continued to have auditory hallucinations that told her to do things to S.L. or to herself. Mother voluntarily admitted herself for treatment at the Human Services Center on October 12, 1985, after she had a "psychotic break" and was found cutting herself with razor blades. Mother was diagnosed schizophrenic, undifferentiated type. Following treatment she was discharged on November 27, 1985.
In January 1986, Father left on a week-long trip to Wisconsin. Given Mother's condition and out of concern for S.L., Father agreed to several days of foster care for S.L. during his absence, after which the grandmother would be available to care for S.L. On the day of Father's departure, January 31, 1986, Mother placed L.L. in her crib at about noon and left her unattended for about eight hours without a feeding or changing. Several days earlier Mother had thrown away her medication because her voices had told her to. On this day, the voices were telling her to ignore her daughter. Mother, realizing her condition, called Maricle about the situation, whereafter L.L. was placed in foster care with her brother on a voluntary basis.
On February 2, 1986, Mother was not taking her medication. On that day she cut her legs with razor blades. She also experienced auditory hallucinations telling her to cut S.L. with a knife and burn him once he returned home. On February 4, a dependence and neglect petition was filed and temporary custody was granted to the Department. Mother was again voluntarily committed for treatment to the Human Services Center on February 13, 1986. She was discharged on May 28, 1986.
An adjudicatory hearing was held on September 4, 1986. The trial court decreed both S.L. and L.L. were dependent and neglected by an order of adjudication dated December 4, 1986. A dispositional hearing was held on November 6, 1986, and on February 6, 1987, the trial court ordered that parental rights be terminated.
Parents argue the Court allowed inadmissible hearsay at the adjudicatory hearing. Kathy Park was allowed to testify as to what she had learned from other people involved. The trial court overruled parent's objection because the State offered her testimony as an expert offering testimony in her field of family relationships and because the State would later produce testimony from the persons who had *692 worked with Park. Parents argue this was prejudicial error. We disagree.
The hearsay testimony was later proven by testimony of Denise Maricle as well as by other evidence. Mother's communications to Maricle were not privileged but were admissible under SDCL 26-10-15. Matter of M.C., 391 N.W.2d 674 (S.D.1986). Since Park's testimony concerning the history of the case was later proven by other evidence, the hearsay testimony was merely cumulative. Moreover, there is a presumption that when an action is tried to a court, the trial court will disregard the inadmissible evidence. People In Interest of M.W., 374 N.W.2d 889 (S.D.1985).
Parents do not point to specific findings of the court that were based merely on the hearsay evidence. We must assume the court did not consider such hearsay evidence. Even without the hearsay, there was clear and convincing evidence of dependence and neglect, and given the cumulative nature of the evidence, we do not believe the court would have reached a different result.
Parents second argument is that the evidence supporting the dependency and neglect adjudication of L.L. was not clear and convincing and therefore the adjudication should be overturned. We disagree.
In People In Interest of K.C., 414 N.W. 2d 616 (S.D.1987), we summarized the analysis that governs in dependency and neglect cases.
The ruling in Santosky [v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)] increased the state's burden of proof at an adjudicatory hearing by requiring each allegation in the petition be proven by clear and convincing evidence. People In Interest of S.H., 323 N.W.2d 851 (S.D.1982). If the trial court finds that the allegations of the petition are supported by clear and convincing evidence in cases concerning dependent and neglected children, the court shall sustain the petition. SDCL 26-8-22.10.

In Matter of S.S., 334 N.W.2d 59 (S.D. 1983), this court stated whether dependency and neglect exists is question of fact for the trial court. This statement is essentially accurate. The state must prove allegations of fact in its petition by clear and convincing evidence, and the trial court must determine the truth of the evidentiary facts offered by the State. The trial court must also satisfy itself that an ultimate fact which establishes dependency and neglect is similarly supported by clear and convincing evidence. An ultimate fact would be one of the factors listed in SDCL 26-8-6, such as whether, based on all the evidence, the court is able to find the child "lacks proper parental care," or that the child's "environment is injurious to his welfare."
Whether a child is dependent and neglected is probably more accurately viewed as a mixed law-fact question because when the court finds that an ultimate fact under SDCL 26-8-6 exists and has been proven by clear and convincing evidence, the court may conclude as a matter of law that the affected child is dependent and neglected as defined by SDCL 26-8-6. However, the trial court's primary analysis in reaching its decision is factual....
The trial court's findings of fact will not be set aside by this court unless they are "clearly erroneous." SDCL 15-6-52(a). In applying this standard, the question before this court is not whether we would have made the same findings the trial court did; rather, the question is whether, after a review of all the evidence, we are convinced that a mistake has been made. People in Interest of T.H., 396 N.W.2d 145 (S.D.1986); Matter of S.M., 384 N.W.2d 670 (S.D.1986); Wiggins v. Shewmake, 374 N.W.2d 111 (S.D. 1985); Matter of D.H., 354 N.W.2d 185 (S.D.1984). We must determine "whether the trial court was clearly erroneous in finding the evidence supporting termination was clear and convincing." Matter of S.M., supra; Interest of T.H., supra; Matter of S.S., supra. (Footnotes omitted).
Interest of K.C., 414 N.W.2d at 620.
In this case the trial court agreed with the allegations in the petition and determined four ultimate facts existed under *693 SDCL 26-8-6. The court found the children lacked "proper parental care," the children's "environment was injurious to their welfare," the children were "threatened with substantial harm," and the children had "sustained emotional harm or mental injury." Under these findings the court concluded the children were dependent and neglected as a matter of law pursuant to SDCL 26-8-6.
Under SDCL 26-8-6, any one of the eight subparts to that statute standing alone is enough to sustain a dependency and neglect adjudication as long as that ultimate finding is supported by clear and convincing evidence. In this case all four of the trial court's ultimate findings are supported by clear and convincing evidence and apply to L.L. as well as S.L. At the adjudicatory hearing, Dr. W. Vail Williams (Williams), Associate Professor of Clinical Psychology at the University of South Dakota, testified as to the problems and needs of S.L. and L.L. Based on records of evaluations supplied by Kathy Park and his own observations, Williams stated both children had significant mental delays, especially in the areas of social interaction and emotional maturity. Dr. Jose Carrera concurred with Dr. Williams assessment of the children's psychological and emotional problems. In addition, other witnesses testified as to the condition of these children.
Parents third argument is that the certain dispositional findings of fact and conclusions of law were not based on clear and convincing evidence sufficient to support the finding that termination was the least restrictive alternative. We disagree.
In Interest of K.C., we stated:
The Santosky decision arguably dealt only with the standard of proof in dependency and neglect adjudications. Nevertheless, this court has held the clear and convincing standard must be used at both the proceedings. Matter of D.B., 382 N.W.2d 419 (S.D.1986); People in the Interest of L.A., 334 N.W.2d 62 (S.D.1983). We have therefore held "the trial court must find by clear and convincing evidence that termination of parental rights is in the child's best interests." Matter of C.L. and R.P., 397 N.W.2d 81 (S.D.1986); Interest of T.H., 396 N.W.2d at 148; Matter of S.M., 384 N.W.2d at 674; Matter of D.H., 354 N.W. 2d at 188. We have also held that the question whether termination is the least restrictive alternative is examined from the child's point of view. Matter of C.L., supra; Matter of S.M., supra. In short, the trial court must "find" by clear and convincing evidence that termination is the least restrictive alternative commensurate with the best interests of the child.
Parents state that finding of fact number seven and eight are not supported by clear and convincing evidence and are therefore clearly erroneous. We disagree. Finding seven states that the parents are unfit. Finding eight states that Mother has failed proper care of the children. We believe the record supports these findings.
Parents further argue that finding of fact number five, six, eleven, and twelve are not supported by clear and convincing evidence and therefore are clearly erroneous. We disagree. Findings five and six declare that appropriate services given the family have failed and further services would be unavailing because Mother's illness is expected to continue, which would only exacerbate the children's condition. Finding eleven states that the children face potential harm if they remain with their parents. There is evidence for these findings as well. At the adjudicatory hearing, Dr. Williams stated his opinion on Mother's prognosis for the future. He based his opinion on records and reports submitted through Kathy Park and Denise Maricle, medical records from the Human Services Center, and a personal evaluation of Mother. In his opinion, Mother's illness would probably continue for most of her life, and even with medication she would probably still have periods of relapse. He stated the acute phases of Mother's illness directly impaired her ability to provide proper care for her children and placed them at risk of potential harm. Therefore, he recommended termination.
*694 Finding of fact twelve states that termination is the least restrictive alternative commensurate with the best interests of the children. This finding was entered as a finding of fact and as a conclusion of law.
In Interest of K.C. we indicated that, on appeal, the question of whether termination is the least restrictive alternative commensurate with the best interests of the child is essentially an issue of fact governed by the clearly erroneous standard of review.
The trial court must enter its final determination as a conclusion of law since it must decree its final judgment in the case. The nature of the question before the court, however, is "essentially factual." The trial court makes a subjective determination as to the narrowest means of providing for the needs of the child. This ultimate finding of fact will not be overturned unless clearly erroneous.
There are no separate findings of fact in this case that are clearly erroneous. In any case, even if one or more lesser findings were clearly erroneous, remaining findings of fact must be insufficient to establish termination is the least restrictive alternative commensurate with the best interests of the child before a decision to terminate parental rights is reversed on appeal. Since the trial court's final determination is itself essentially a question of fact, an erroneous finding of fact used by the court to support its final decision is not fatal if there are other findings of fact that together clearly and convincingly support termination.
The other appellants in this case, L.R. and A.R., the maternal grandparents of S.L. and L.L., argue that temporary placement with the grandparents would have been a less restrictive alternative that should have been tried before termination occurred. We disagree.
The best interests of the children are controlling. The experts at trial indicated the parents should not be allowed further contact with the children. Such contact would inevitably occur if the children were placed with relatives. Moreover, an eventual return to the parents would be inappropriate because Mother's condition was not expected to improve. It is also obvious the conditions in the grandparents would not work for the children due to grandfather's health and other considerations.
The decision of the trial court is affirmed.
MORGAN and MILLER, JJ., concur.
HENDERSON and SABERS, JJ., dissent.
HENDERSON, Justice (dissenting).
The majority opinion, after establishing that the law of this State requires evidence that is clear and convincing to justify findings of dependency and neglect and to support termination of parental rights, proceeds to reduce that relatively high standard to nothing. I dissented when this was done in In re K.C., 414 N.W.2d 616, 621-25 (S.D.1987) (Henderson, J., dissenting), and I must dissent today.
Clear and convincing evidence is that which is so clear, direct, weighty, and convincing so as to allow the trier of fact to reach a clear conviction of the precise facts at issue without hesitancy as to their truth. In re S.H., 337 N.W.2d 179 (S.D.1983). How, then, is this standard applied?
It is possible to conclude, from reading the majority opinion, that we are sliding back from the clear and convincing standard mandated by Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), toward the pre-Santosky unconstitutional preponderance of the evidence standard, or, still worse, a "mere scintilla" standard. The majority, when it notes "[t]here is evidence for these findings as well," is treading close to the edge. We are losing track of the essential nature of these proceedings. Evidence must not merely be in the record, it must be clear and convincing. We are, as Santosky reminded us, dealing with serious interests on all sides here, and cannot shirk our constitutional responsibility to provide *695 meaningful review to those whose rights a court would extinguish.
SDCL 26-8-35 sets out alternatives short of outright termination. Subsection (1) provides that a court may place a neglected or dependent child with a relative, under such restrictions as the court may impose. Given the strong interest in such a placement shown by the maternal grandparents in this case, such an option seems viable. Total termination of the entire bloodline's rights is not the least restrictive alternative here. "`[T]his Court [the United States Supreme Court] has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" K.C., 414 N.W.2d at 625 (Henderson, J., dissenting) (quoting Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960)). Again, as in K.C., this principle has not been followed.
The careful reader of the majority opinion will note that it is silent about the father's conduct and attitude toward the children. It appears from the record that the father has a long history of steady employment, support of his children, and a loyalty to his wife. One cannot glean from the record that he has any serious deficits. His sin seems to be to remain married to a schizophrenic and to love her, support her, care for her, and try to regain her mental health. Testimony discloses that the mother has attempted, rather successfully, to stabilize her schizophrenia by way of medication. It seems that after the report of Dr. Williams was made available, heavily relied upon by the State, no reintegration of the family was tried. Another very troublesome factor in my considerations on the least restrictive alternative, is that no placement was ever made with the extended family. A social worker in the Department of Social Services' Yankton office, in a home study of the grandparents, based upon a most thorough investigation, opined that the grandparents would be a suitable placement option. A reader can determine from the record that the mother has made some improvement and she seems to be getting very little, if any, credit for it. Certainly, the trial court had the right to consider Dr. Williams' report, but Dr. Williams' opinion should not be the deciding factor in this case. As an example, a Dr. Tuan's testimony reflects that the mother could be capable of functioning as a parent. It is the dispositional hearing testimony (November 6, 1986) that is so vital when considering termination. Mother was released from treatment at the Human Services Center in May 1986, and for approximately six months thereafter (up to the dispositional hearing date), she appeared to faithfully take her medication which generally controlled her illness and had her schizophrenia in remission. It appears to this reader that appropriate services to the family were offered in 1984 and 1985 which resulted in some progress; however, there do not appear to have been any further services offered to this family after the children were put in temporary foster care at the end of January 1986. There is no repeated alcohol or drug abuse such as we factually saw demonstrated in In re C.M., 417 N.W.2d 887 (S.D.1988), where this Court upheld termination of parental rights. Nor do we see here a recent felony conviction of mother as depicted in the C.M. scenario. In C.M., a veritable battery of extended professional services were made available to the parents; whereas, in this case, after the Department of Social Services took the children into foster care, the Department of Social Services either neglected or refused to provide services. Therefore, this ruling has disregarded Santosky, 455 U.S. at 753, 102 S.Ct. at 1394-95, 71 L.Ed.2d at 606, for the Department of Social Services caused the "fundamental liberty interest[s]" to "evaporate" after the parents "lost temporary custody of their child[ren] to the State." Id.
I respectfully suggest that these children also have a right to maintain a biological tie to their parents, grandparents, and extended family under the facts of this case. The Department of Social Services has opposed placement with an extended family member for fear of future contact by the *696 parents.[1] There is nothing, which I can read, suggesting that the father is an unfit father, nor that the maternal grandparents would not be a viable alternative. Removal, via termination, is so final. "The termination of parental rights means the end of parental rights and duties toward a child." M. Hardin & A. Shalleck, Court Rules to Achieve Permanency for Foster Children: Sample Rules and Commentary, 97 (1985). "Generally, a termination decree ends the duty of support as well as parents' rights to visit, communicate, or have information regarding the child." Id. See also Wald, State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights, 28 Stan.L.Rev. 623, 690 (1976). As it is noted, SDCL 26-8-36 recites, inter alia, that all parental rights may be terminated upon entering a decree. Options were not here explored and a member of the Department of Social Services disagrees with the State's position, having submitted a home study of the grandparents reflecting that said home would be a suitable placement option. There are many available alternatives that a circuit judge has, other than to forever terminate children from their parents and their extended family. Under SDCL 26-8-35, there are
less intrusive measures which the court can consider as an alternative to terminating parental rights. If, on a review of the record, it appears that the state's compelling interest in the well-being and welfare of the children can reasonably be insured by less intrusive means, we must order that those alternatives first be implemented.
In re B.E., 287 N.W.2d 91, 95 (S.D.1979).
Mental patients do come back. This mother was experiencing some continued progress in dealing with her mental illness problems. This entire case raises an interesting point of law: Can this State, or any state, terminate the parental rights forever of an individual who is mentally ill? Surely, the State of South Dakota recognizes its obligation to provide the services necessary to bring back to good mental health those individuals who have had a nervous breakdown or become deranged to the point where they no longer can care for themselves. South Dakota statutory law abounds with the protection of the mentally ill. SDCL 27A-3-10 instructs us that the Department of Social Services has a responsibility to consider the needs in the field of mental health and to make recommendations to the Governor and Legislature. SDCL 27A-4-8 informs us of the purpose of the Human Services Center at Yankton, South Dakota, which is to provide care, treatment, and rehabilitative services. There are other pertinent statutes under SDCL Title 27A pertaining to mentally ill persons. All of them reflect compassion, as distinguished from disdain, toward mentally ill persons. Praise an enlightened people! SDCL 27A-6-1 relates to the Interstate Compact on Mental Health. Article I thereof describes a purpose of proper and expeditious treatment of the mentally ill so as to benefit the patients, their families, and society as a whole. In SDCL chs. 27A-9, -10, and -12, I note the careful and compassionate intent of the statutes enacted by the elected representatives of this state to our State Legislature to protect the rights of mentally ill persons. In SDCL 27A-12-1, it is noted that the individual privacy and dignity of mentally ill persons is to be respected; in connection therewith, SDCL 27A-12-12 instructs on the objectives of treatment programs, essentially to maximize patients' skills. Many enumerated rights are found in these statutes for mentally ill persons and SDCL 27A-12-33 instructs us that all of these enumerated rights for the benefit of persons in the Human Services Center do not limit or replace other constitutional and legal rights. Therefore, the Department of Social Services should do an about-face in this state and begin to recognize the spirit of our state statutes in trying to protect, *697 help, and aid mentally ill persons and not to totally destroy their lives by taking their children away from them. Why, then, does the State in this case sink a mother further into deeper schizophrenia by taking away her children? This action flies in the face of the announced policy of our State Legislature. My reading of the transcript reflects that Dr. Tuan expressed an opinion that as of the mother's discharge from the Human Services Center on May 28, 1986, she was capable of returning to society and performing normal functions. His opinion further shows that she would be able and capable of functioning as a parent, if she continued to take her medication to keep her illness under control. Therefore, it is difficult for me to understand how a clear and convincing evidence standard has been met when the entire termination is based upon the mother's mental illness. This Court has stated that "termination of parental rights is a drastic, final step that should be exercised with great caution." B.E., 287 N.W.2d at 95.
I am deeply influenced by the tremendous effort of not only the affected family, but the extended family, to keep these children within the family. A family is the core unit of society, not the State, and it is the most powerful institution in society. We, in the law, owe a duty to protect and preserve it and to be especially aware of any attack upon it by Statism. Birth is a mystery of God's creation. Fostered by human love, children are entrusted to parents as a part of God's great plan.[2] In perpetuating the human race, God set parents over children, and the Law should be ever so cautious in interfering with that edict. I can well understand the State's laudable zeal to care for unfortunate children, but there is a delicate balance that must be maintained so that the core unit of society is not destroyed by the State. As early as 1921, in Ex Parte Summers, 43 S.D. 617, 181 N.W. 831 (1921), this Court held that the rights of a natural parent are not to be set aside except for strong and compelling reasons. In 1953, in Blow v. Lottman, 75 S.D. 127, 59 N.W.2d 825 (1953), this Court reaffirmed its earlier expressions and concern about a parent's right to custody over their own children. We then held that the parent's right to custody over their own children should never be disturbed unless upon a clear showing against the parent of gross misconduct or unfitness, or of other extraordinary circumstances affecting the welfare of the child. In 1979, this holding was reannounced in B.E., 287 N.W.2d 91.[3] In B.E., *698 as well as in In re R.Z.F., 284 N.W.2d 879, 882 (S.D.1979), we began to express the concept of balancing the rights of the natural parent with the interests of the children. We reflected in both of those cases that the children's best interests must always prevail, and this is easy to understand if it is obvious that the children's best interests will be greatly subserved by keeping the children in the custody of the natural parents. It is extremely difficult to balance the rights of the natural parents against the interests of the children on a case-by-case basis. And it almost requires the wisdom of Solomon to determine what is right or wrong in these cases. My reading reflects the discussion of the rationale behind the balancing requirement. See In re S.M.M., 349 N.W.2d 63, 64 (S.D.1984), Chief Justice Fosheim, writing for a unanimous Court:
In determining whether to terminate parental rights, the paramount consideration is the best interests and welfare of the child. SDCL 26-8-36; In re M.S.M., 320 N.W.2d 795 (S.D.1982). It is hazardous, however, to assume that removing a child from an imperfect home invariably will benefit the child. People in Interest of S.L.H., 342 N.W.2d 672 (S.D.1983); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Although parents and their children do not have identical interests, the parental interest in the companionship, care and custody of the children is a strong one and is reciprocated by the child's equally weighty interest in the nurture, love and instruction of the parents. In re S.L.H., 342 N.W.2d 672; Lehman v. Lycoming County Children's Services, 648 F.2d 135 (3rd Cir.1981), aff'd, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982). The trial court should therefore balance the rights of the parent with the best interests of the child and the public. In re P.M., 299 N.W.2d 803 (S.D.1980). (Emphasis supplied.)
Thus, indeed, it is of deep concern in weighing the children's best interests, that one consider the natural love of a child for its parents, and that this is all swept aside if termination of parental rights becomes final. Having expressed my reasons in this dissent, my ultimate conclusion is that this Court should hold a definite and firm conviction that a mistake has been made below. In re D.M., 367 N.W.2d 769 (S.D. 1985); In re M.J.B., 364 N.W.2d 921 (S.D. 1985).
SABERS, Justice (dissenting).
The majority's main authority is In re K.C., 414 N.W.2d 616 (S.D.1987). I could not support the termination of the Father's rights in K.C. then and cannot now. The termination of the Father's parental rights in this case is closer to In re C.M. and M.N., 417 N.W.2d 887, 889 (S.D.1988), where I was the lone dissenter. Although *699 placement with the father would have been more clearly within the children's best interests in C.M. and M.N. than here, I dissent for the reasons set forth in my dissents in K.C. and C.M. and M.N.
NOTES
[1] Apparently, there are three different families who do not want to see these children cut away from the family institution. These include a cousin of father and her husband from Minnesota; a sister of the mother; and the maternal grandparents.
[2] This author appreciates that we are not an ecclesiastical Court. However, we draw upon scripture for strength and guidance. This is because our Nation is founded upon, basically, a Judeo-Christian ethic. We find that parental obligations toward children are nourishment in 1 Samuel 1:22; training as set forth in Proverbs 22:6 and Ephesians 6:4; instruction per Galatians 4:1-2; responsibility as reflected in 1 Samuel 17:15; and inheritance which is depicted in Luke 12:13-14. Children have duties of obedience through Ephesians 6:1-3; honoring their parents by virtue of Exodus 20:12 and Hebrews 12:9; respect for their elders by way of Proverbs 23:22 and 1 Peter 5:5; caring for their parents by word of 1 Timothy 5:4; and children also owe obligations of obedience to a Deity by virtue of Deuteronomy 30:2 and Ecclesiastes 12:1. These basic teachings are not law, per se, but our forefathers conceived this Nation in deep, religious conviction. By the Declaration of Independence or the United States Constitution, the forefathers were moved to create a Nation, through a religious philosophy, believing that a firm foundation of right or wrong would perpetuate a lasting Republic. We must be vigilant that Statism does not replace the family function. The Declaration of Independence, in its first paragraph, refers to "laws of nature and of nature's God"; and in the second paragraph thereof, refers to a Creator endowing us with certain inalienable rights, which include life, liberty, and the pursuit of happiness. The first Bill of Right protects the free exercise of religion, said amendment being ratified on December 15, 1791. The Preamble to the South Dakota Constitution begins: "We, the people of South Dakota, grateful to Almighty God for our civil and religious liberties...."
[3] South Dakota's judicial history has reflected, for decades, an abiding belief that the strong tie between natural parent and child should simply not be severed unless there is gross unfitness, extraordinary circumstances, or strong and compelling reasons. This state, by its constitution and its holdings, presaged the holdings of the United States Supreme Court in Shelton and Santosky. In footnote 2 of this dissent, I emphasized the religious bent of pre-Constitutional America. In Basic American Documents (edited by G. de Huszar, H.W. Littlefield & A.W. Littlefield (1956)), several documents antedating our United States Constitution reflect the religious background of our United States Constitution, for example, the Virginia Bill of Rights, Article 16 (June 12, 1776) (reprinted in de Huszar, at 40), and the preamble to the Fundamental Orders of Connecticut (January 14, 1639) (reprinted in de Huszar, at 12). Natural law/religious underpinnings are obvious in the Declaration of Independence and find certain echoes in the Articles of Confederation (March 1, 1781) (reprinted in de Huszar, at 53). The Virginia Bill of Rights was drafted by George Mason, incorporating an article on religious freedom written by Patrick Henry. The Virginia Bill of Rights anticipated the Declaration of Independence by almost a month. As I witness the plethora of cases instituted in South Dakota by the Department of Social Services to separate mother and father from childand to terminate these natural rights forevermy mind fastens on the religious influences of colonial society and the formation of America. See also South Dakota Constitution art. VI, § 27, the maintenance of free government by a frequent recurrence to fundamental principles. Arthur Schlesinger, Jr., in The Cycles of American History (1986), writes:

Others, in the midst of flounder and flux, strive to resurrect the old ways.
... If the law of acceleration is not to spin the world out of control, society must cherish its lifelines into the past. That is why, even in this age of whirl, so much of the old abides.
... Traditions endure, from which, consciously or not, we draw sustenance.
The law of acceleration hurtles us into the inscrutable future. But it cannot wipe the slate of the past.
Schlesinger, at foreword xi-xii. Breakups in the American family should be discouraged. Though social change, burgeoning bureaucracy, scientific theory and technology have dazzled and confused the present generation, we must draw strength and national character from our family and constitutional roots.