In the Matter of J.Z., Alleged Dependent and Neglected Child.

No. 15473.

Supreme Court of South Dakota.

Argued on Rehearing Nov. 17, 1987.

Reassigned Feb. 26, 1988.

Decided May 11, 1988.

Janice Godtland, Asst. Atty. Gen., Pierre, for appellee State; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.

Douglas E. Kludt of Churchill, Manolis, Freeman & Kludt, Huron, for appellant Mother.

MILLER, Justice (on reassignment on rehearing).

This case first came before this court in an appeal by L.Z. (Mother) from a circuit court order terminating her parental rights concerning her son, J.Z. We reversed, finding the evidence supporting the trial court's order to be neither clear and convincing, and that less restrictive alternatives to termination of parental rights existed. *Matter of J.Z.*, 410 N.W.2d 572 (S.D. 1987).

State filed a petition for rehearing and this court granted rehearing by order of September 25, 1987. We heard oral argument on November 17, 1987. The case was ultimately reassigned to this Justice on February 26, 1988.

On rehearing, we now conclude that the trial court did not err in terminating parental rights over J.Z. and we therefore affirm.

## FACTS

A reading of our prior decision and dissent sets forth a detailed recitation of the facts. We will expand upon or reiterate those facts when dealing with the issues decided below.

## DECISION

On appeal, we must ascertain whether the trial court was clearly erroneous in finding that the evidence supporting termination was clear and convincing. *Matter of A.H.*, 421 N.W.2d 71 (S.D.1988); *J.Z., supra; Matter of K.C.*, 414 N.W.2d 616 (S.D.1987). We have consistently stated that the trial court's findings will not be set aside unless, after reviewing the evi-

dence, we are left with a firm and definite conviction that a mistake has been made. *Matter of L.B.*, 416 N.W.2d 598, 599 (S.D. 1987); *People in Interest of T.H.*, 396 N.W. 2d 145 (S.D.1986); *People in Interest of M.W.*, 374 N.W.2d 889 (S.D.1985); *In re A.M.*, 292 N.W.2d 103 (S.D.1980).

■ We make our examination from the child's point of view, not the parents', remembering that the principal concern is the child's best interests. *People in Interest of C.L.*, 356 N.W.2d 476 (S.D.1984); *In re R.Z.F.*, 284 N.W.2d 879 (S.D.1979). Children are entitled to stability and certitude in their lives. *T.H., supra; People in Interest of J.S.N.*, 371 N.W.2d 361 (S.D.1985).

■ The trial court's findings under attack in this appeal are as follows:

. . . .

3. That according to Frank Dame, a clinical psychologist, [Mother] is a paranoid schizophrenic and said psychiatric condition cannot be eliminated through treatment.

4. That according to Frank Dame, said psychiatric condition is not likely to improve and will likely cause further impulsive behavior and poor judgment on the part of [Mother].

5. That according to Frank Dame, [Mother] has great difficulty dealing with stress, and consequently, there is a severe potential threat of injury to said [J.Z.].

6. That [Mother] is unable to accept the responsibility of raising [J.Z.], nor does she possess the capability to provide a suitable home or proper parental care for [J.Z.].

. . . .

9. That the testimony of Frank Dame, an expert, is factually correct.

We believe that the trial court accurately characterized and evaluated the testimony of Dr. Dame. In addition to his testimony as outlined in our prior decision and dissent, we note that:

(1) Dr. Dame's testimony indicated that Mother's mental illness was life-threatening to J.Z.

(2) Dr. Dame's testimony that Mother's schizophrenia 'was in remission and she no longer experienced hallucinations or delusions' does not detract from his other testimony when considering his definition of 'in remission' as meaning:

That the person is not acutely psychotic. The person is not hallucinating nor is the individual delusional, but the individual's thinking, reasoning and emotional experiences continue to bear major elements of a schizophrenic process.

(3) In response to cross-examination and argument that since Mother was past the five-year mark of her mental illness she would likely improve, Dr. Dame testified that her condition merely has a 'tendency' to improve over a period of time and that

in some individuals it—the research typically [takes] about a five-year period. For some individuals it's less, for some individuals it's longer, for some individuals the improvement is never obvious. The person remains in a life-long pattern of vulnerability of stress, so in a supportive stable situation where the stress is not likely to change, some of these individuals can function in a level stable fashion. Where the stress is likely to be higher at times and lower at times, we typically see a pattern of unstable behavior.

(4) Dr. Dame further explained that because Mother lived in an unstable environment, coupled with her difficulties with the law, her alcohol abuse, her difficulties in parenting J.Z., her living condition, and her employment situation, her rate of improvement would be impeded.

(5) Dr. Dame's original report, which was considered by the trial court, contained the following language:

The results of the testing suggest a long-term, chronic, paranoid schizophrenic diagnosis, which is at this time in remission. In spite of the improved behavioral stability that has been achieved through the use of anti-psychotic medications, (mother) is still exceptionally rigid and inflexible in her behavior, she is substantially below av-

erage in the use of her intellect, and is likely to continue experiencing severe difficulties in exercising mature judgment. The use of denial and projection as the prominent ego defense mechanisms, substantially reduces her ability to deal effectively with her environment, and perhaps most importantly it results in her being insensitive to her own needs and feelings as well as those of others. As is commonly the case, she has been deprived of a normal, healthy and emotionally responsive relationship with a parent figure, and as a result she is without the sensitivity, emotional responsiveness and nurturing behaviors that are necessary to raise a child.

Inasmuch as this psychotic condition cannot be eliminated through treatment and is likely to be permanently and severely handicapping, and inasmuch as there will be a continuing series of crises stemming from impulsive behavior and poor judgment, it is the recommendation of this examiner that (mother's) parental rights be terminated.

Based upon all of the foregoing, coupled with the language in our prior decision and dissent, we conclude that the trial court's findings were not clearly erroneous. Certainly it was a difficult decision in a most important, emotional action. However, we are not left with a firm and definite conviction that a mistake has been made.

We are truly sympathetic with Mother and her situation. We have even more sympathy for the child. However, we cannot base our decisions on sympathy. *In re J.W.W.*, 334 N.W.2d 513 (S.D.1983); *In re J.M.*, 479 So.2d 826 (Fla.App. 2 Dist.1985); *In re W.D.N.*, 443 So.2d 493 (Fla.App. 2 Dist.1984). We must take the facts presented and apply the appropriate law without resorting to our emotions.

Being convinced that the trial court did not err, we affirm its decision.

WUEST, C.J., and MORGAN, J., concur.

HENDERSON and SABERS, JJ., dissent.

HENDERSON, Justice (dissenting).

State's Motion for Rehearing is a seven-page brief—a rehash—if you will—of this entire case; it is replete with quotes from the record, numerous citations, actual quotes of witnesses from the record, and a barrage of argumentative verbosity covering the entire case. Said Motion (a Petition for Rehearing) violates this Court's appellate procedure. "Such petition shall state *briefly and without argument* the issue, fact or law claimed to have been overlooked or misapprehended by the court." SDCL 15–25–3 (emphasis added).

The essence of the State's petition for rehearing, and the majority opinion, is that the evidence provided by Dr. Frank Dame, a psychologist, and the trial court's findings of fact based thereon, clearly and convincingly supported termination of L.Z.'s (J.Z.'s mother) rights. Such is not the case.

While a selective reading of his testimony arguably supports termination, he contradicted himself so often on key points that his testimony can hardly be the basis of any termination decision which could meet the "clear and convincing" burden of proof established by *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and adopted by this Court for both adjudicatory and dispositional stages of termination proceedings. *In re K.C.*, 414 N.W.2d 616 (S.D.1987); *In re L.A.*, 334 N.W.2d 62 (S.D.1983). We have interpreted "clear and convincing" evidence to be that which is so clear, direct, weighty and convincing as to allow the trier of fact to reach a clear conviction of the precise facts at issue without hesitancy as to their truth. *In re S.H.*, 337 N.W.2d 179 (S.D.1983). The evidence in this case does not meet that standard.

Dr. Dame's report and his testimony established that Mother suffered from paranoid schizophrenia, a mental illness characterized by impaired memory, reasoning ability, and judgment. Mother was suspicious, and had difficulty trusting others, feeling emotionally close, and expressing emotion. He noted that children of parents

with these behavior patterns often develop similar problems. Mother's ability to deal with stress was limited, and, if combined with alcohol or drug abuse, her perception of reality could break down and she could endanger her son. The psychologist wrote, in his evaluation dated March 6, 1986, that her psychiatric condition could not be eliminated through treatment, and she was likely to be permanently and severely handicapped. He recommended that Mother's parental rights be terminated.

The above evidence was belied, however, by other testimony by this same psychologist: Mother's schizophrenia was in remission, and she no longer experienced hallucinations or delusions; her remission could last for many years; twenty-five percent (25%) of all schizophrenics recover completely and permanently; and after five years duration, the psychosis generally does not progress further and actually recedes. He opined that Mother was past the five-year mark, and she would likely improve. Mother's psychological condition had already improved greatly, in part due to anti-psychotic medicine which she took. Further, millions of people are schizophrenics, many of whom are successful parents.

Largely based on Dr. Dame's testimony, the trial court terminated Mother's rights. Dr. Dame was mentioned, by name, in no less than four of the court's dispositional findings of fact. Others were also based on his testimony. Interestingly, the trial court found insufficient evidence to support a finding that J.Z. was physically abused, which was the original justification for removing him from his Mother's care. There is no evidence that J.Z. suffered from poor nutrition or was inadequately clothed. The trial court found that Mother's relationship with her son was a loving one.

This record does not justify severing Mother's rights to her child. The internal conflict in Dr. Dame's testimony undercuts the trial court's essential findings, as a ripple effect spreads from one finding of fact to another, leaving virtually none unshaken. The State's evidence was neither clear nor convincing.

I note, as Justice Sabers did in an earlier opinion of this Court, that " '[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.' " *J.Z.*, 410 N.W.2d at 575 (quoting *Santosky v. Kramer*, 455 U.S. at 753, 102 S.Ct. at 1394–95, 71 L.Ed.2d at 606). This parental interest is not absolute or unconditional, *see, e.g., In re B.E.*, 287 N.W.2d 91 (S.D.1979); *In re N.J.W.*, 273 N.W.2d 134 (S.D.1978), but it cannot be discarded on the basis of the evidence presented here. J.Z. was happy with his Mother, and improved when exposed to outside stimuli provided by day-care. There is no good reason for failing to return him to his loving Mother. Viewed from J.Z.'s perspective, termination is unwarranted. This child loved his Mother dearly.[1]

While paying lip service to the "best interests of the child," the majority too blithely ignores the harm termination can wreak on children's lives:

There are at least two ways a child might be harmed by termination. First, if a child is attached to her parents, termination may harm the child by preventing continued contact after placement. While some children come to view their foster parents as their "psychological parents," several studies have found that other children in placement remain strongly attached to their natural parents, even if the parents visit relatively infrequently or the placement is of long duration.

A child may even benefit from having two sets of "parents," especially in situations where the natural parents visit frequently. The natural parents' continued presence may prevent the child from feeling abandoned by them. Even if the

---

**1.** As he goes about his day, playing, which is a child's work, or as he is tucked away at night, surely he must wonder: What happened to my Mother? Where is she? He was two years old when the State took him away for "physical abuse" (which was never established).

natural parents visit relatively infrequently, the child may suffer emotional problems if contact with her parents is totally precluded. Recent studies of adopted children indicate that many adoptees wish to know their natural parents and may even wish to return to them.

\* \* \* \* \* \*

Thus, termination may leave a child truly in limbo....

M. Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights*, 28 Stan.L.Rev. 623, 672–74 (1976) (footnotes omitted). Further:

> The breaking of a bond or attachment by the removal of an important caregiver from the life of a child usually results in at least acute distress and if prolonged can lead to psychological change in many areas of functioning. Therefore, removal of a child from a parent to whom she is attached may not be appropriate, even where the parent provides only marginal care for the child.

E. Kinnie & M. Hardin, *Psychological Indications Whether a Neglected Child Should Be Removed or Returned to Parents*, in *Foster Children in the Courts* 518, at 523 (M. Hardin ed. 1983) (footnote omitted). This Court has recognized such interests on the part of the child:

> Although parents and their children do not have identical interests, the parental interest in the companionship, care and custody of the children is a strong one and *is reciprocated by the child's equally weighty interest in the nurture, love and instruction of the parents.*[2] *In re S.L.H.*, 342 N.W.2d 672 [S.D.1983]; *Lehman v. Lycoming County Children's Services*, 648 F.2d 135 (3rd Cir.1981), *aff'd*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).

*In re S.M.M.*, 349 N.W.2d 63, 64 (S.D.1984) (emphasis added). *See also In re S.L.*, 419 N.W.2d 689, 698 (S.D.1988) (Henderson, J.,

dissenting). As a Nation, we must be vigilant that "Statism does not replace the family function." *Id.* at 697 n. 2. We are a Nation founded upon, basically, a Judeo–Christian ethic. We build our culture and character around families, not the State's power.

To affirm the trial court is tantamount to approving the permanent removal of children from those who are temporarily mentally ill, a conclusion I cannot support. Mental illness, alone, is not sufficient to justify termination. *In re K.G.O.*, 12 Kan. App.2d 7, 738 P.2d 98 (1987); *E.L.B. v. Texas Dep't of Human Servs.*, 732 S.W.2d 785 (Tex.Ct.App.1987).

> The existence of a prognosis that a person will, at some time in the future, turn out to be a poor parent should not, standing alone, serve as the basis for terminating parental rights. There should be some demonstration of a present failure to properly perform the parenting role (as, for example, in the case of a severely mentally retarded parent) or, in the alternative, substantial certainty that the parent will not be able to perform that role with minimal adequacy.

*In re Wyatt*, 34 Or.App. 793, 797, 579 P.2d 889, 891 (1978). As the Oregon Court observed in *Wyatt*, while reversing a termination based on psychological and psychiatric testimony that a mother's test scores and history indicated a probability she would abuse her child:

> Boiled down, all the recommendations were based upon the fact that this mother is, as one witness put it, an "antisocial personality," who is more likely than the average person to be abusive to her child *some day.*

*Wyatt, id.* (emphasis in original). *See also In re Anderson*, 35 Or.App. 561, 582 P.2d 29 (1978).

As Justice Sabers writes in his current dissent, the State's case is no more than allegations, or "guesstimates of the future." Termination, harmful to both parent and child, should be premised on more.

---

**2.** Emotions of this child are germane to our considerations. It is part of his make-up. His emotions can be of fulfilled joy or great dejection.

**818**

SABERS, Justice (dissenting).

I dissent for the reasons set forth in my prior opinion in *J.Z.*, 410 N.W.2d 572 (S.D. 1987), and for the following reasons.

In termination cases, the evidence supporting termination must be clear and convincing. It was not here; it was *neither* clear *nor* convincing. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

A fair review of the evidence shows that most of the allegations against Mother were just that—allegations and nothing more than allegations. The evidence which minimally supported those allegations related to instances which occurred long before the child was removed. These instances occurred during a period when Mother's illness was most severe and prior to its remission. It is one thing for the DSS to act on unsupported charges but quite another for the trial court to terminate parental rights on that basis. If the DSS has proof or evidence, they should be required to use it not just hint at it. In this case, the termination rests on the self-contradictory "guesstimates of the future" by a psychologist who has not even seen the mother and the child together. The law, justice, and fairness requires more. *Santosky, supra.*