Kendall ROBINSON, Petitioner
and Appellant,

v.

Herman SOLEM, Appellee.

No. 15851.

Supreme Court of South Dakota.

Argued Feb. 18, 1988.

Decided Nov. 23, 1988.

Rehearing Denied Dec. 22, 1988.

Richard Braithwaite, Sioux Falls, for petitioner and appellant.

Roger A. Tellinghuisen, Atty. Gen., Thomas Harmon, Asst. Atty. Gen., Pierre, for appellee.

STEELE, Circuit Judge.

Kendall Robinson (Robinson) appeals from an order denying his application for a writ of habeas corpus. We affirm.

## PROCEDURAL HISTORY

This habeas corpus appeal arises from the facts recited by this court in Robinson's direct appeal. *State v. Robinson,* 399 N.W.2d 324 (S.D.1987). Only those facts pertinent to this appeal are reiterated here.

Robinson pled insanity. He was found guilty but mentally ill (GBMI) of one count of escape and one count of aggravated assault. He was sentenced to a total of 22 years in the state penitentiary. In his direct appeal, he claimed that under the GBMI statute (SDCL 23A–27–38), he could be involuntarily subjected to treatment at the discretion of the institutional authorities without notice and opportunity to be

heard, thus exposing him to liberty deprivations greater than these faced by an offender who is merely found guilty.

·This court held that his argument relating to a due process violation was premature because at that point there had been no determination that he needed further treatment, that it was available, or that treatment would be a condition of parole. We indicated that if, in the future, Robinson could show some unlawful detention, he could apply for a writ of habeas corpus when the issue was ripe for determination.

In his application for a writ of habeas corpus Robinson does not ask for medical treatment. Instead, he attacks the constitutionality of the GBMI statutory scheme. At the habeas corpus hearing he testified that he was incarcerated in the South Dakota State Penitentiary, that he had been examined by a psychiatrist and found to be in need of treatment, and that the institution was not providing for such treatment. He now contends that the GBMI statutes are violative of due process rights because under the statutory scheme, the institutional officials may, in their discretion, deny treatment even though an offender is found to be in need.

Robinson also contends that his conviction was void because of inadequate representation by counsel at his trial. He claims that his trial counsel, over his objection, presented expert testimony concerning the issue of insanity. Robinson contends that his testimony was not helpful and assured his conviction, and that defense counsel abandoned his insanity defense in final arguments.

## I.

WHETHER SOUTH DAKOTA'S GUILTY BUT MENTALLY ILL STATUTORY SCHEME IS VIOLATIVE OF DUE PROCESS RIGHTS BECAUSE ITS PROVISION FOR PSYCHIATRIC TREATMENT IS DISCRETIONARY RATHER THAN MANDATORY.

We hold: that South Dakota's Guilty But Mentally Ill statutory scheme is not violative of due process rights merely because it does not assure treatment to an offender found guilty but mentally ill.

The 14th Amendment to the United States Constitution, U.S. Const. amend. XIV, and Article VI, Section 2 of the Constitution of the State of South Dakota, S.D. Const. art VI, § 2, prohibit the deprivation of liberty without due process of law. The test to measure the validity of a statute under these constitutional provisions is whether the statute is reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety, and general welfare. *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *People v. Carter*, 135 Ill.App.3d 403, 90 Ill.Dec. 212, 481 N.E.2d 1012 (1985).

By enacting South Dakota's GBMI statutes, our legislature intended to provide an alternative verdict available to a jury to reduce the number of offenders who were erroneously found not guilty by reason of insanity. The GBMI statutory scheme in Illinois is substantially the same as that of South Dakota.

In *People v. Carter, supra,* the Illinois Appellate Court found that a statutory scheme which enables a court or jury to find defendants guilty who are not so mentally ill as to be legally insane, and also provides procedures for treating such defendants, is reasonably designed to remedy a problem affecting the general welfare; such a statutory scheme is thus not violative of substantive due process. The Illinois Appellate Court held in *People v. Smith*, 124 Ill.App.3d 805, 80 Ill.Dec. 310, 465 N.E.2d 101 (1984) that the fact that treatment is not assured to one found guilty but mentally ill does not of itself render the statute constitutionally defective.

SDCL 23A–27–38 provides:
If a defendant is found "guilty but mentally ill" or enters that plea and the plea is accepted by the court, the court shall impose any sentence which could be imposed upon a defendant pleading or found guilty of the same charge. If the defendant is sentenced to the state penitentiary, he shall undergo further exami-

nation and may be given treatment that is psychiatrically indicated for his mental illness. If treatment is available, it may be provided through facilities under the jurisdiction of the board of charities and corrections. The board of charities and corrections may transfer the defendant from the penitentiary to other facilities under its jurisdiction and return the defendant to the penitentiary after completion of treatment for the balance of the defendant's sentence.

SDCL 22-1-2(24) defines "mental illness" as

a substantial psychiatric disorder of thought, mood or behavior which affects a person at the time of the commission of the offense and which impairs a person's judgment, but not to the extent that he is incapable of knowing the wrongfulness of his act. Mental illness does not include abnormalities manifested only by repeated criminal or otherwise antisocial conduct.

■ In his direct appeal Robinson claimed that SDCL 23A-27-38 violated his procedural due process rights because he could be forced to undergo involuntary treatment without notice and opportunity to be heard on the question of whether he was in fact in need of treatment. In this appeal, he is claiming that a jury has found him to be mentally ill; that he has been found to be in need of treatment; and that he is not receiving treatment. His current claim is, in effect, that he is not receiving adequate medical care. The obligation of the government in that regard is embodied in the Eighth Amendment prohibition against cruel and unusual punishment as well as in the due process clause of the 14th Amendment.

■ In finding a defendant mentally ill under South Dakota's GBMI statute, judge or jury does not find that treatment is needed, but only that the offender has a psychiatric disorder of thought, mood, or behavior which impairs his or her judgment. There is no constitutional right to treatment merely because of that finding. Once found to be guilty but mentally ill, a defendant who is incarcerated becomes a ward of the executive branch as a prisoner. A prisoner is entitled to treatment only if a mental health provider, exercising ordinary care and skill, concludes with reasonable medical certainty: (1) that the offender's symptoms evidence a serious disease or injury; (2) that the disease or injury is curable or may be substantially alleviated; and (3) that there exists potential for harm to the offender by reason of delay or the denial of care would be substantial. The essential test is one of medical necessity and not simply treatment which may be considered as merely desirable. *Bowring v. Godwin*, 551 F.2d 44 (4th Cir.1977); 60 Am.Jur.2d Penal and Correctional Institutions § 94 (1987).

■ South Dakota's GBMI statutes provide that the prisoner *must* be psychiatrically examined; however, the need for treatment is a determination properly left to the medical examiner. If treatment is deemed medically necessary, the determination as to the nature of, place of, extent, and duration of treatment should be within the prerogative of the prison officials. The courts have traditionally given deference to those decisions and will not intervene in the absence of fundamental constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 69 L.Ed.2d 59, 101 S.Ct. 2392 (1981); Annotation, *Prisoners' Rights to Medical Care*, 28 A.L.R. Fed. 279 (1976). As the Supreme Court of Illinois pointed out in *People v. Kaeding*, 98 Ill.2d 237, 74 Ill.Dec. 509, 456 N.E.2d 11 (1983), the legislature could not have intended to mandate treatment for all persons found guilty but mentally ill; it would be folly to waste limited resources for treatment of defendants for whom treatment would not be helpful.

■ If a prisoner, including one found to be guilty but mentally ill, claims that he is in need of treatment and that it is being denied him, there are remedies available. These remedies include a writ of habeas corpus application requesting that the treatment be made available or that he be released (*See* State of *Minnesota v. Young*, 282 Minn. 529, 163 N.W.2d 49 (1968)), a grievance procedure, appealable to the courts, under ARSD 17:50:06, and a peti-

tion for relief under the Civil Rights Act (42 U.S.C. § 1983 (1982)).

In Robinson's direct appeal, this court considered the GBMI statutory scheme in light of the Eighth Amendment prohibition against cruel and unusual punishment and ruled that the statutes of themselves do not violate that constitutional provision. We now hold that the GBMI statutory scheme is not violative of due process merely because treatment is not assured.

We do not at this time rule on the question of whether the GBMI statutory scheme is violative of procedural due process because it may *compel* psychiatric treatment of a prisoner without opportunity to be heard on the question of current mental illness or the necessity for treatment. Robinson has not been compelled to undergo treatment against his will; he thus lacks standing to raise the question and the issue is not ripe for determination in this case.

## II.

### WHETHER ROBINSON RECEIVED ADEQUATE REPRESENTATION OF COUNSEL AT HIS TRIAL.

We hold: that Robinson received adequate representation of counsel at his trial.

At his trial Robinson pled insanity to the charges against him. The facts were abundantly clear that he had escaped from the Hughes County jail and that in the process of doing so, he assaulted a law enforcement officer. The insanity plea was thus his most viable defense.

Insanity is an affirmative defense, and the burden is on the defendant to show by clear and convincing evidence that he was insane at the time of the alleged offense. SDCL 22-5-10. The state, therefore, has no obligation to submit any evidence of sanity in its case in chief.

Robinson contends that the state's expert, Dr. Pesce, testified in the state's case that Robinson was *insane,* and that when the state rested there was some evidence of insanity upon which Robinson should have relied. Instead, defense counsel called its own expert, Dr. Lord, in Robinson's case and over Robinson's objection Dr. Lord did not unqualifiedly testify that Robinson was insane. On cross-examination Dr. Lord admitted that at the time of the offense, Robinson knew the difference between right and wrong. Robinson claims that under these circumstances, defense counsel made a judgment which amounted to ineffective assistance of counsel. Robinson further claims that in the final argument defense counsel abandoned the insanity defense and instead argued that Robinson was mentally ill.

We find Robinson's claims to be without merit. In the first place, Robinson misplaces the order of proof as it occurred. The state, at the time it rested, rightfully had presented no evidence pertaining to the insanity defense. The state's expert was presented as a *rebuttal* witness to Robinson's expert. Prior to the time for presentation of Robinson's case, his attorney had access to a letter report authored on June 4, 1985, by the state's expert, Dr. Pesce. In that letter, Dr. Pesce stated that he "... [h]ad no reason to believe that he [Robinson] was insane at the time of the crime."

After the state had rested its case in chief, the burden shifted to Robinson to present some evidence of insanity. Defense counsel had no reason to believe that the state's own expert would testify that Robinson was insane in direct contradiction to his letter report. Under the circumstances, defense counsel did the best he could with what he had; he called Dr. Lord, a psychiatrist, who testified that Robinson had a psychological disorder that affected his mood, behavior and thought, and that Robinson had lost contact with reality. Although under cross-examination Dr. Lord did testify that in his opinion Robinson knew the difference between right and wrong, a jury could have concluded from the whole of Dr. Lord's testimony, coupled with testimony from certain lay witnesses, that Robinson was temporarily insane at the time the offense was committed.

Dr. Pesce, the state's expert, was called by the state in rebuttal. At the end of his testimony, the state asked him:

Question: [d]octor, do you feel that there was anything that resulted from your examination which would lead you to believe that he [Robinson] was at anytime insane?

Answer: Yes.

Notwithstanding the above answer, Dr. Pesce earlier in his testimony stated that he did not regard Robinson to be mentally ill or to have any memory deficits; that he had a good memory without amnestic episodes, and did not display any evidence of a psychotic disorder. It appears from a fair reading of all of Dr. Pesce's testimony that in giving his answer to the question regarding Robinson's sanity, he merely misunderstood a question rather inartfully asked. In any event, defense counsel on cross-examination wisely did not ask Dr. Pesce to clarify his response.

■ The record clearly shows that defense counsel did not abandon the insanity defense in closing argument. He did what he could with Dr. Lord's testimony, and argued to the jury that with the evidence presented, they could find his client temporarily insane. He asked for a verdict of not guilty by reason of insanity.

■ In order to succeed on an ineffective assistance of counsel claim, two requirements must be met: (1) that counsel's performance was deficient; (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Luna v. Solem*, 411 N.W.2d 656 (S.D.1987). In this case, Robinson has shown neither.

The holding of the trial court is affirmed.

WUEST, C.J., concurs.

MORGAN, J., concurs in part and concurs in result in part.

SABERS, J., concurs in result in part and dissents in part.

HENDERSON, J., dissents.

STEELE, Circuit Judge, sitting for MILLER, J., disqualified.

MORGAN, Justice (concurring in part, concurring in result in part).

I concur in the disposition of the first issue, the constitutionality of the "guilty but mentally ill" statutory scheme; however, I concur in the result only as to the second issue, adequacy of the representation of counsel.

My problem with the majority opinion with regard to the second issue is the statement therein: "Insanity is an affirmative defense, and the burden is on the defendant to show by clear and convincing evidence that he was insane at the time of the alleged offense. SDCL 22–5–10." I would point out that the offense charged occurred on May 8, 1985. SDCL 22–5–10 was enacted at the 1985 legislative session. It did not have an emergency clause. Therefore, the statute did not become effective until July 1, 1985. I would consider a statute that changes the burden of proof of the defendant from the burden of producing evidence (a simple defense) to the additional burden of persuasion (an affirmative defense) to be an ex post facto law and, therefore, not applicable to this offense.

My concurrence in the first issue is reluctant. In *State v. Robinson*, 399 N.W.2d 324 (S.D.1987), there was a strong dissent representing the views of two members of this court. I think that the majority opinion correctly pointed out that the views of that dissent were premature and that is why I concurred therein. I wish that the legislature would take heed of that dissent and strive as diligently to correct the statutory scheme as it has to change the burden of proof. It might avoid a possible future problem when a majority possibly would decide that the time has come to apply the reasoning of that dissent.

SABERS, Justice (concurring in result in part and dissenting in part).

Although I maintain my belief that SDCL 23A–27–38 is unconstitutional for reasons expressed in Justice Henderson's dissent in *Robinson I*, I concur in the result of this part of this case on the basis that Robinson's current challenge to the constitutionality of SDCL 23A–27–38 is pre-

mature. If Robinson wants and needs "psychiatrically indicated" treatment for his mental illness, and such treatment is denied, he has available remedies. Robinson seeks release, not treatment, and he has not yet established grounds for either.

I would reverse and remand for a new trial because the trial court's Instruction #14 improperly required Robinson to prove his insanity by clear and convincing evidence under SDCL 22-5-10. This is plain error. This statute is unconstitutional and requires reversal as plain error. SDCL 23A-44-15 provides "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court." *State v. Breed*, 399 N.W.2d 311 (S.D.1987); *State v. Brammer*, 304 N.W.2d 111 (S.D.1981).

The fatal constitutional defect of SDCL 22-5-10 is that it places upon the defendant "the burden of proving the defense of insanity by clear and convincing evidence." The State cannot constitutionally require a defendant to do more than raise a reasonable doubt as to his sanity, i.e., the defendant's burden of persuasion cannot exceed raising "a reasonable doubt." It is an unconstitutional invasion of the presumption of innocence to exceed this point. S.D. Const. art. VI, § 2.

The State must prove each and every element of the crime charged beyond a reasonable doubt. Most serious crimes contain an element which overlaps sanity. Therefore, if the defendant raises a reasonable doubt as to his sanity, it becomes constitutionally inconsistent and impossible for the State to prove the overlapping element of the crime *beyond* a reasonable doubt.

Therefore, the statute poses a very great danger for jury confusion and for conviction by less than beyond a reasonable doubt and is unconstitutional. S.D. Const. art. VI, § 2.

HENDERSON, Justice (dissenting).

## OUR STATE PRISON SHOULD NOT IMPRISON THE MENTALLY ILL WITHOUT TREATMENT

In *State v. Robinson*, 399 N.W.2d 324 (S.D.1987) (*Robinson I*), three Justices of this Court, over two dissents, told this defendant that his constitutional challenge to SDCL 23A-27-38 was not ripe for hearing, as "[n]one of the possibilities provided in the statutes have occurred to him...." *Id.* at 327. Robinson's time has come, for the viper created by that statute has now hatched.

After a jury trial on charges of escape and aggravated assault, Robinson was found guilty, but mentally ill. He was sentenced to concurrent terms of five and twenty-two years in the State Penitentiary. As mandated by SDCL 23A-27-38, Robinson was examined by a psychiatrist (here, the prison psychiatrist), who found that Robinson needed treatment, and that such treatment was available. Between the time Robinson was sent to the Penitentiary on November 4, 1985, and the time of his habeas corpus hearing on April 4, 1987, he received no treatment for his mental illness. SDCL 23A-27-38 permits prison authorities to ignore the diagnosed mental illness of guilty but mentally ill prisoners. This scenario was presaged by the dissents in *Robinson I. See Robinson I, id.* at 330 nn. 4 & 5.

SDCL 23A-27-38, set out in the majority opinion, is unconstitutional in that it violates rights protected by the Eighth (cruel and unusual punishment) and Fourteenth (due process) Amendments to the Constitution of the United States.[1] The majority's reliance on cases interpreting the Illinois "Guilty But Mentally Ill" (GBMI) statutes is unfortunate, for the Illinois Legislature provided far more protection to the mentally ill than did its South Dakota counterpart.

1. This is an appeal arising from denial of a writ of habeas corpus, the "Great Writ of Liberty." *See Reutter v. Meierhenry*, 405 N.W.2d 627, 631 (S.D.1987) (Henderson, J., dissenting). Robinson alleges he is unlawfully imprisoned, as he was convicted under a statute which unconstitu-tionally deprives him of due process and imposes cruel and unusual punishment. In the habeas court below, he sought treatment, to remedy the Eighth Amendment violation, but his plea was shunted aside. Habeas Transcript, at pages 11-12.

The Illinois cases cited by the majority (*People v. Kaeding*,[2] 98 Ill.2d 237, 74 Ill. Dec. 509, 456 N.E.2d 11 (1983); *People v. Carter*, 135 Ill.App.3d 127, 90 Ill.Dec. 212, 481 N.E.2d 1012 (1985); and *People v. Smith*, 124 Ill.App.3d 805, 80 Ill.Dec. 310, 465 N.E.2d 101 (1984)), are inapposite to Robinson's current appeal. The Illinois equivalent (using the term loosely) to SDCL 23A-27-38, Section 5-2-6 of the Unified Code of Corrections (Ill.Rev.Stat.1981, ch. 38, para. 1005-2-6), reads, in pertinent part, as follows:

> (b) If the court imposes a sentence of imprisonment upon a defendant who has been found guilty but mentally ill, the defendant shall be committed to the Department of Corrections, which shall cause periodic inquiry and examination to be made concerning the nature, extent, continuance, and treatment of the defendant's mental illness. The Department of Corrections shall provide such psychiatric, psychological, or other counseling and treatment for the defendant as it determines necessary.

Analysis of Section 5-2-6 (Illinois statute aforesaid) indicates that it may pass scrutiny under the Eighth Amendment. *See* Comment, *Punishment versus Treatment of the Guilty But Mentally Ill*, 74 J.Crim.L. & Criminology 428,449 (1983), published by the Northwestern University School of Law, Chicago, Illinois:

> Since Illinois requires guilty but mentally ill inmates to receive "periodic inquiry and examination to be made concerning the nature, extent, continuance and treatment of the defendant's mental illness," cursory attention to this provision by the Department of Corrections will probably prevent any eighth amendment challenge. Right to treatment claims have generally failed when prison officials have made some attempt to treat. (Footnotes omitted.)

Contrasting the Illinois and South Dakota statutes reveals a profound divergence. These statutes are not substantially sim-

ilar. Unlike the Illinois law, SDCL 23A-27-38 does not *require* prison officials to do more than examine the prisoner. He *may* be treated later, but this is left entirely to the discretion of the board of charities and corrections. Even if treatment is determined to be necessary and available, the prisoner can be allowed to sit and rot without treatment under SDCL 23A-27-38: "If the defendant is sentenced to the state penitentiary, he shall undergo further examination and *may* be given the treatment that is psychiatrically indicated for his mental illness." (Emphasis added.)

## IMPRISONING THE MENTALLY ILL WITHOUT TREATMENT IS BARBARIC—VIOLATIVE OF THE EIGHTH AMENDMENT

The United States Supreme Court, in discussing prisoners' rights under the Eighth Amendment, has written:

> Our more recent cases, however, have held that the [Eighth] Amendment proscribes more than physically barbarous punishments. The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...," against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain,"....
>
> These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.

*Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S.Ct. 285,290, 50 L.Ed.2d 251,259 (1976) (citations omitted). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104, 97

---

**2.** The Illinois Supreme Court, in *Kaeding*, was addressing a challenge based on equal protec-

tion, which Robinson did not raise in his habeas corpus appeal.

S.Ct. at 291, 50 L.Ed.2d at 260 (citation omitted). There is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart." *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir.1977). *See also Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979). The Fourth Circuit Court of Appeals, in *Bowring,* opined that convicted prisoners have a right to psychiatric treatment under both Eighth and Fourteenth Amendments for the following reason:

Concomitant with the general philosophy that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country," *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), prisoners are guaranteed the provision of life's basic necessities for the period of their confinement. Constitutional doctrine has absorbed the common law view that "[i]t is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself." *Spicer v. Williamson,* 191 N.C. 487, 490, 132 S.E. 291, 293 (1926).

*Bowring,* 551 F.2d at 46–47.

How well does SDCL 23A–27–38 compare to the "evolving standards of decency that mark the progress of a maturing society" (to use *Estelle's* words)? *Estelle,* 429 U.S. at 102, 97 S.Ct. at 290, 50 L.Ed.2d at 259. It fails miserably, representing no less than a throwback to the days when insane asylums were storage pens and little more. Compare our statute to the relevant section of its Michigan equivalent, Mich. Comp.Laws § 768.36(3); Mich.Stat.Ann. § 28.1059(3): "If the defendant is committed to the custody of the department of corrections, he shall undergo further evaluation and be given such treatment as is psychiatrically indicated for his mental illness or retardation." The Michigan statute was upheld in *People v. McLeod,* 407 Mich. 632, 288 N.W.2d 909 (1980), where the Michigan Supreme Court ruled that departmental failure to follow the mandates of the statute did not make the statute unconstitutional. The opposite problem occurs here; our statute requires no treatment at all!

Given the due process violations noted by this author and Justice Sabers in *Robinson I* and the Eighth Amendment violation apparent here, this statute must be rejected. The public is ill-served by a scheme that allows the mentally ill to be stored away (out of sight, out of mind) without treatment, with their illness festering, only to be released on an unsuspecting populace years later. As the United States Supreme Court noted, in *Jones v. United States,* 463 U.S. 354, 364, 103 S.Ct. 3043, 3049, 77 L.Ed. 2d 694, 705 (1983) (wherein that Court wrote than an insanity acquittal reasonably supported an inference of continued mental illness and need of treatment), "[t]he fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Id.* (footnote omitted).

## ROBINSON WAS DENIED DUE PROCESS OF LAW

Although Robinson's current appeal appears to be at odds with his due process argument, presented in *Robinson I,* to the effect that compelled psychiatric treatment without a hearing, under SDCL 23A–27–38, constituted a violation of his rights to due process of law, the due process flaws of the statute, as seen in the earlier appeal, also arise here. However, our thoughts and analyses must probe this subject more deeply. The State, in arguing that Robinson has not been deprived of any rights, emphasizes that Robinson's proof of his need for treatment is weak, as it is based on his own oral testimony. Had the constitutional mandates of *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (seven minimum procedural safeguards to ensure proper classification of prisoners, see *Robinson I,* 399 N.W.2d at 329 (Henderson, J., dissenting)), been followed, such a problem would not exist. There would have been a hearing establishing a record upon which we could rely. Instead, there is a limitation upon which to base our decision. No hearing was held because our statutes (unconstitutionally)

require none. There are no procedural safeguards for defendants under this statutory scheme. Even if a correct determination of Robinson's mental state was made (a question difficult to assess on this record), no treatment need be given. The lack of due process and inhumane nature of our statutes reinforce each other, to Robinson's detriment.

In South Dakota, GBMI prisoners are trapped in limbo. They are painted with a "mentally ill" brush, subject to involuntary commitment without the due process protections of *Vitek,* 445 U.S. 480, 100 S.Ct. 1254, or worse, warehoused without any treatment at all, even where their need for mental care is established by the same authorities which deny them care, as has happened to Robinson. Even if the testing provided for in our statute, by itself, did not deny Robinson due process, the ability of the prison authorities to cavalierly disregard medical findings that definitely indicate a need for treatment is barbaric.

It has been said that GBMI prisoners are "incarcerated for their crimes, not their mental condition." *People v. Marshall,* 114 Ill.App.3d 217, 233, 70 Ill.Dec. 91, 102, 448 N.E.2d 969, 980 (1983). In my opinion, that statement is only partly true. The label "mentally ill," attached to them by statute, is a form of punishment itself: "[T]he long-lasting injury to reputation occasioned by being labelled 'mentally ill' may be even worse than that caused by a criminal conviction alone." L. Fentiman, *"Guilty But Mentally Ill": The Real Verdict is Guilty,* 26 B.C.L.Rev. 601, 632 (1985) (footnote omitted) (citing *Bartley v. Kremens,* 402 F.Supp. 1039, 1046 (E.D.Pa. 1975)). "Thus, far from obtaining special help for their mental problems, these GBMI prisoners are actually worse off than if they had simply been found guilty." Fentiman, *supra,* at 632. It is apparent that Robinson and those like him are penalized because of (a) their guilt and (b) their

mental condition for both concerns are inherent in the GBMI label.

[A]lthough they [GBMI prisoners] are not subject to indefinite imprisonment, the stigma of their criminal convictions is compounded when they are labelled "mentally ill." In light of this added stigma and in recognition of the likelihood that mental illness actually contributed to their criminal behavior, *guilty but mentally ill defendants should be guaranteed treatment which meets fourteenth amendment standards.*

Comment, *Punishment versus Treatment of the Guilty But Mentally Ill,* 74 J.Crim.L. & Criminology 428, 453 (1983) (emphasis added; footnote omitted). "[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435, 451 (1972). It is not reasonable to heap an additional penalty on the GBMI prisoner because of his illness, when compared to those who commit their crimes with rational calculation. Compassion, understanding, brotherhood, followed by treatment—four healing hands—where are thee? Note this author's expressions of concern for mental patients in this state in *In re S.L.,* 419 N.W.2d 689, 694 (S.D. 1988) (Henderson, J., dissenting).

Numerous authorities have opposed the legislative stampede by many state legislatures toward GBMI. This opposition is reflected in the American Bar Association's Criminal Justice Mental Health Standards (Section 7–6.10(b), adopted on August 7, 1984), the American Psychiatric Association Statement on the Insanity Defense (December 1982), and a report by the National Mental Health Association's Commission on the Insanity Defense (National Mental Health Association, *Myths and Realities: A Report of the National Commission on the Insanity Defense,*[3] 32–34 (March

**3.** Well do I remember the South Dakota State's Attorney Association fervently lobbying our State Legislature for the current GBMI statutes. South Dakota newspapers covered these lobbying efforts extensively and the maneuverings concerning their ultimate passage. Legislative

Research Council records, for the year 1983, reflect that Rick Johnson, then President–Elect of the South Dakota State Bar Association, appeared, on behalf of the lawyers of this state, to oppose this legislation. He was accompanied by the Honorable William Sahr, Secretary–Trea-

1983)). *See* Slobogin, *The Guilty But Mentally Ill Verdict: An Idea Whose Time Should Not Have Come*, 53 Geo.Wash.L. Rev. 494, 496 (1985). Many writers assail these statutes. See, for example, Fentiman, *supra;* Slobogin, *supra;* Comment, *Guilty But Mentally Ill: Broadening the Scope of Criminal Responsibility*, 44 Ohio St.L.J. 797 (1983); Comment, *Punishment versus Treatment of the Guilty But Mentally Ill*, 74 J.Crim.L. & Criminology 428 (1983). Add my voice to this outcry against legislative lemmings. We, in South Dakota, joined the stampede.

## CONSTITUTIONALITY OF SDCL 22-5-10

Appreciative of the deep concern of my colleague, Justice Sabers, for the procedural unconstitutionality of SDCL 23A–27–38, in which he continues to join my expressions per my dissent in *Robinson I*, and his serious reflections on the constitutionality of SDCL 22–5–10, I feel compelled to express my views on an allegedly improper instruction, concerning the proof of insanity, by clear and convincing evidence. Justice Sabers recognizes this as "plain error." In my opinion, SDCL 22–5–10 is constitutional. The rule which prevailed in this state prior to 1985, providing that a rebuttable presumption of a defendant's sanity existed, and, if that presumption was overcome, put the burden on the state to prove the defendant's sanity beyond a reasonable doubt, was statutory, not constitutional, in origin.

In *State v. Waugh*, 80 S.D. 503, 509, 127 N.W.2d 429, 432 (1964), this Court wrote:

SDC 13.0201, *which is the basis of our rule*, classifies lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness, as persons not capable of committing crimes. On the other hand, SDC Ch. 13.05 enumerates defensive matters that excuse or exonerate from punishment. Insanity is not included in the list. (Emphasis added.)

The above passage reveals that this Court premised its decision, in *Waugh*, on two statutory bases which the Legislature removed in 1985 S.D.Sess.L. ch. 192 (H.B. 1369). Section 10 of the new law deleted SDCL 22–3–1(3), formerly part of SDC 13.-0201, which classified "insane" persons among those incapable of committing crimes.[4] Section 11 of the new law added a new section (now SDCL 22–5–10), to SDCL ch. 22–5, which provides that insanity is an affirmative defense to be proven by the defendant by clear and convincing evidence. As both statutory props for the old rule have been removed by legislative action, the rationale for the old rule explained in *Waugh* is no longer valid.

As our former rule was statutory, not constitutional, our prior case law provides no constitutional authority invalidating SDCL 22–5–10. Justice Sabers' contention that the new statutory scheme is unconstitutional is unsupported by overwhelming legal authority; weighty authority favors SDCL 22–5–10. *See Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). In an attempt to overturn *Leland*, some legal authority has utilized *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). However, this has been rejected by federal circuit courts considering the constitutional validity of the Insanity Defense Reform Act of 1984 (see 18 U.S.C. § 17), which is similar to SDCL 22–5–10. *See United States v. Freeman*, 804 F.2d 1574 (11th Cir.1986); *United States v. Amos*, 803 F.2d 419 (8th Cir.1986). The United States Supreme Court, after *Mullaney*, expressly refused to reconsider

surer of the State Bar. Past sheriffs and then current sheriffs helped lobby this legislation through the Legislature.

4. SDC 13.0201(4) contained the "lunatics, insane persons, and all persons of unsound mind ..." provision referred to in *Waugh*. 1976 S.D.Sess. L. ch. 158, § 3–1, amended SDCL 22–3–1(4), formerly SDC 13.0201(4), to provide that "mentally ill" persons were incapable of committing crimes. 1983 S.D.Sess.L. ch. 174, § 3 (S.B. 90) substituted "insane" for "mentally ill" and renumbered the subsection 22–3–1(3). SDCL 22–3–1(3) was deleted in 1985.

*Leland* in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). On the foundation of *Leland* and *Patterson,* therefore, I respectfully disagree with my colleague, Justice Sabers.

Pertaining to the "clear and convincing" evidence required of any defendant under SDCL 22-5-10, I likewise would follow the United States Supreme Court's lead in *Leland,* by which it is constitutional to require a defendant to prove his insanity beyond a reasonable doubt. "It is axiomatic, therefore, that a lesser standard of proof, such as the clear and convincing standard, may be imposed." *Amos,* 803 F.2d at 421. The trial court's instruction defining "clear and convincing" evidence was consistent with the language of this Court in *In re S.H.,* 337 N.W.2d 179 (S.D. 1983), and *In re J.W.W.,* 334 N.W.2d 513 (S.D.1983). Therefore, I could not base a reversal on the unconstitutionality of SDCL 22-5-10.

### HOPE FOR THE MENTALLY ILL?

It takes spirit to win a ball game and it takes spirit to win a war. It takes spirit to precipitate change. I am saddened by the decisions of this Court involving those stricken with mental illness. *See,* for example, dissent in *In re S.L.,* 419 N.W.2d 689, 694-99 (S.D.1988) (Henderson and Sabers, JJ., dissenting); also, *see* dissent in *In re J.Z.,* 423 N.W.2d 813, 815-18 (S.D.1988) (Henderson and Sabers, JJ., dissenting); *see also* dissent in *Lather v. Huron College,* 413 N.W.2d 369, 372-76 (S.D.1987) (Henderson and Sabers, JJ., dissenting). The mentally ill can come back; this is the message. In the past week, as I write, a report from Washington, D.C., has rebuked and assailed the caring for the mentally ill in this state. As recently as September 15, 1988, Governor George Mickelson of South Dakota addressed this scalding criticism. The Argus Leader article is reprinted here in full:

Gov. George Mickelson thinks criticism of mental health care in South Dakota can be blamed partly on the system's organization, an aide said Wednesday.

Mickelson responded to a report issued Tuesday in Washington. It said: "Services for the seriously mentally ill in South Dakota are organized in such a bizarre fashion that it is a wonder that anything gets done." South Dakota ranked 27th of 50 states.

The governor's office is preparing a written response to the report. "The governor will state his belief that reorganization will improve mental health care and correct deficiencies noted," said Bill Garnos, project director.

Mickelson already has proposed a constitutional amendment reorganizing the structure being blamed for some of the problems. Now, the state institutions are overseen by the Board of Charities and Corrections, and local community mental health centers are overseen by the state Office of Developmental Disabilities and Mental Health under the Department of Social Services.

Mickelson's plan would place both under the Department of Human Services.

"Parts of the system are governed by different philosophies, different goals, and different bosses," Garnos said. The reorganization would improve the system by bringing together the community-based and institution-based services, he said.

Donna Yocom, president of the South Dakota Alliance for the Mentally Ill, agreed that organizational problems are partly to blame for the criticism.

Families of mentally ill often complain that the system is fragmented, she said. Patients are released from state institutions without coordination with community centers.

John Henderson, administrator of the state Human Services Center in Yankton, said there is a communication problem between the Yankton institution and community health centers. Reorganization would streamline communication and allow for more timely follow-up on patients as well as better use of funds.

Henderson said parts of the report were dated and since have been corrected. He also responded to the report's

criticism that a federal inspection found cockroaches and mouse droppings in the center's kitchen. "Anybody that lives in the Midwest knows when it gets cool this time of year, mice get in. We're not infested with mice, I guarantee."

*Mickelson: Mental health care needs to be reorganized,* Argus Leader, Sept. 15, 1988, at 1C. This writer senses certain waves of change. Exemplifying this, is an Associated Press article of September 22, 1988, the day I finished this writing. *Legislative committee endorses board split,* Argus Leader, Sept. 22, 1988, at 3C. The thrust of the article is that a legislative interim committee, The Interim Committee on Correctional Issues, has decided, on an 8-to-1 vote, to reorganize state government creating (if the voters would approve of a constitutional change) two new departments: A Department of Corrections to oversee adult prisons, parole programs, and treatment programs for juvenile offenders; and a Department of Developmental Disabilities and Mental Health.[5] This latter department would control the Redfield State Hospital and School, Custer State Hospital, the Human Services Center at Yankton, and community programs which deal with mental health and disabled people, and the alcohol and drug abuse program, which is now in the Health Department, and the Division of Vocational Rehabilitation, same being currently an independent state department. Now, mental health services in this state are divided among three state agencies. Overlapping functions, created thereby, spell delay in the care for the mentally ill in South Dakota under our present statutes. It is my fervent hope that as the mental health caldron bubbles, a goodness will surface to enrich these poor souls. Robinson, at this time, although mentally ill, per the prison psychiatrist, languishes in prison without treatment. An enlightened people should not tolerate such type of government, and the courts of law, where people seek refuge for wrongs, should stand firmly against such type of warped social justice. Philadelphia Freedom, shine the light, shine the light. Shine the light on the Robinsons warehoused in the prisons of this country.

On November 8, 1988, subsequent to my writing above, this Nation elected a new President, George Bush, and in the State of South Dakota, the people, via ballot, changed our constitution in several respects, including Constitutional Amendment D, which permits an improved management for and a separation of the State Penal System with such unrelated facilities as our state mental hospital and Veterans' Home. Overwhelmingly, the people decided to change our constitution on Constitutional Amendment D; 171,087 votes yes and 121,731 votes no. We shall watch this constitutional amendment precipitate a change, as it flows from the state Veterans' Home at Hot Springs, South Dakota, in the Black Hills, across the prairies to the "School for the Developmentally Disabled" at Redfield (formerly the school for the feeble-minded), thence to the "State Hospital for the Mentally Ill" (new official name) near the banks of the Missouri River in Eastern South Dakota, located at Yankton, and thence to the extreme eastern part of our state at Sioux Falls where the South Dakota State Penitentiary is situated. Hopefully, this amendment shall be a thoroughfare for healing thoughts and action so that beautiful souls become open and ready for all things.

---

**5.** If the constitutional amendment prevails, it would be wise for the State Legislature, who obviously must pass many amendments to existing statutes, to confront the unconstitutional GBMI statute scheme to eradicate the constitutional infirmity which now exists under the supreme law of this land as announced by the United States Supreme Court.